COMMONWEALTH *vs.* LUIS ZULUAGA
(and three companion cases[1]).

No. 96-P-1.

Middlesex. March 14, 1997. - October 10, 1997.

Present: DREBEN, GILLERMAN, & FLANNERY, JJ.

*Search and Seizure,* Electronic surveillance, Warrant, Probable cause. *Eavesdropping. Probable Cause. Constitutional Law,* Search and seizure, Self-Incrimination. *Practice, Criminal,* Reconsideration, Verdict, Assistance of counsel, Argument by prosecutor. *Jury and Jurors. Evidence,* Declaration against interest. *Due Process of Law,* Declaration against interest.

In the circumstances of law enforcement officers' interception of a conversation by wiring one of the participants with his consent, the judge hearing a motion to suppress evidence was warranted in concluding that the Commonwealth had met its burden of showing, in its warrant application, a reasonable suspicion that such interception would lead to evidence of a designated offense in connection with organized crime and that the Commonwealth came within the exception to the requirements of G. L. c. 272, § 99, set forth in § 99 B 4. [633-634]

Probable cause supported the issuance of a warrant for the interception, monitoring, and recording of conversations by means of wiring a participant with his consent, where the basis of knowledge and the veracity of the named informant were demonstrated. [634-636]

In a criminal case, the judge acted within his discretion in reconsidering and reversing his allowance of the defendants' motion to suppress evidence based on a theory newly raised by the Commonwealth, and the defendants demonstrated no prejudicial unfairness or ineffective assistance of counsel in connection with the judge's reconsideration. [636-638]

In a criminal case, the motion judge properly concluded that an affidavit in support of a warrant for the search of one defendant's residence established probable cause for the search. [638-639]

Evidence at the trial of three defendants on three indictments alleging trafficking in cocaine in excess of 200 grams warranted the jury's finding that the defendants were guilty beyond a reasonable doubt; however, with respect to a fourth indictment one defendant was entitled to a new trial, where the judge's instructions permitted the jury to find the defendant guilty on that indictment on a theory for which there was no evidentiary support. [639-641]

[1]Two against Arlon Osario and one against Hugo Restrepo.

At the trial of a criminal case, in which the police informant, called as a witness by the defendants, asserted his Fifth Amendment privilege and refused to testify, the judge correctly excluded the witness's exculpatory hearsay statement proffered as made against his penal interests, where the record supported the judge's conclusion that there was insufficient corroboration that indicated the statements were trustworthy. [641-646]

That a prosecution witness at a criminal trial contradicted her testimony at a pretrial hearing was insufficient to demonstrate that the Commonwealth knowingly used perjured testimony. [646]

A criminal defendant did not demonstrate that his counsel was ineffective at trial, where he did not show that he was deprived thereby of an otherwise available, substantial ground of defense. [646]

At a criminal trial, the prosecutor's argument to counter the defendant's claims in closing argument that the defendant was set up did not misstate the evidence and did not create a substantial risk of a miscarriage of justice. [646-647]

At a criminal trial, the defendants did not properly preserve an objection to the prosecutor's closing argument; in any event, the judge's curative instruction sufficiently mitigated any harm, and there was no substantial risk of a miscarriage of justice. [647-649]

INDICTMENTS found and returned in the Superior Court Department on April 22, 1993.

Motions to suppress evidence were heard by *Peter M. Lauriat,* J., and the cases were tried before *Howard J. Whitehead,* J.

*Russell C. Sobelman* for Luis Zuluaga.

*Wendy Sibbison* for Arlon Osario.

*Dana A. Curhan* for Hugo Restrepo.

*Sabita Singh,* Assistant District Attorney (*William Bloomer,* Assistant District Attorney, with her) for the Commonwealth.

DREBEN, J. Aided by an informant named Kevin Brathwaite, Lowell and Massachusetts State police set up conditions for a "controlled buy" of a kilogram of cocaine. Caught as distributors of drugs were the defendants Luis Zuluaga, Hugo Restrepo, and Arlon Osario. Each was convicted of trafficking in drugs in excess of 200 grams in Lowell. Osario was also convicted of trafficking in drugs in excess of 200 grams in Dracut. In their appeals from these convictions, the defendants challenge the denial of their suppression motions and assert numerous other errors. We affirm the convictions except that of Osario for trafficking in Lowell. As to that conviction, Osario is entitled to a new trial.

MOTIONS TO SUPPRESS.

1. *Facts.* In his findings on the motions to suppress, the mo-

tion judge explained how the police plan for a "drug buy" led to the apprehension of the defendants. We turn to those findings which were issued after lengthy hearings. On March 30, 1993, Kevin Brathwaite informed Trooper John R. Sprague of the Massachusetts State Police that, while serving a sentence at M.C.I., Gardner, he learned that "Luis," the owner of a travel agency in Lowell, was a substantial cocaine distributor. Brathwaite believed he could effect a large drug purchase from Luis. Following Sprague's instructions, Brathwaite arranged to purchase a kilogram of cocaine for $28,000 from Luis Zuluaga[2] on April 3, 1993 between 10 A.M. and noon.

Sprague sought and obtained a search warrant to "intercept, monitor and record the conversations" between Brathwaite and Zuluaga and his "presently unidentified associates." At some time between March 30 and April 3, Sprague agreed to pay Brathwaite $1,000, if the investigation proved successful and led to arrests and the seizure of cocaine.[3] On the morning of April 3, Brathwaite was outfitted with a hidden device which allowed the police to receive and record his communications. Officers were situated in motor vehicles and on foot for surveillance of the travel agency and its surrounding areas. The police also set up a video camera in a van across the street from the agency.

Brathwaite arrived at the agency about 11:40 A.M. Zuluaga told him to return in an hour, saying his man had the cocaine at his house and would arrive shortly. Thereafter, Restrepo arrived at the agency, spoke briefly with Zuluaga, walked to his car, and, followed surreptitiously by police, drove to the J & P Appliance store at 369 Bridge Street in Lowell where he met Osario. The latter left the store, entered a grey pickup truck and drove off in the direction of Dracut. Restrepo drove back to where his car had previously been parked.

Brathwaite returned to the agency at 1 P.M. and again at 1:30 P.M. but was told by Zuluaga on each occasion that the drugs had not yet arrived. He so informed Sprague. Shortly after 1:30 P.M., Restrepo returned to the agency, met briefly with Zuluaga, and walked to a street where he was picked up by Osario's grey truck. After travelling a short distance, Restrepo disembarked

---

[2]Police investigation had ascertained that Zuluaga was the owner of the travel agency.

[3]Sprague paid Brathwaite $500 on the day of Zuluaga's arrest and $500 a day or two later.

and stepped into a doorway, opened his jacket and placed a light-colored package underneath it. He then walked back to the area of the travel agency where he met Zuluaga on the sidewalk, and the two men entered a doorway between the agency and a "Subway Shop." A few minutes later, Zuluaga returned to the agency, and Restrepo walked away.

Brathwaite once again came back to the travel agency, met Zuluaga and Restrepo, who had returned, and, after Brathwaite took cash from an unmarked police vehicle, the three men entered the doorway between the travel agency and the "Subway Shop." A few minutes later, Brathwaite and Zuluaga came out of the doorway, whereupon Brathwaite gave a signal with his cap indicating that the cocaine had arrived.

The police moved in and arrested Zuluaga. Simultaneously, other officers entered the doorway, descended, and arrested Restrepo at the foot of the stairway. They observed a small storage room to the left of Restrepo, with its door partially opened. After Restrepo's arrest, Brathwaite came down the steps and told the officers that Restrepo and Zuluaga had gone into the storage room. After a brief search of that room, the officers found a package containing approximately one kilogram of white powder in a desk drawer. Upon analysis it was determined to be cocaine, as were the contents of a small package found beside Restrepo when he was arrested.[4]

After the arrest of Zuluaga and Restrepo, officers went to the J & P Appliance store to arrest Osario, the operator of the grey pickup truck. Seeing the truck drive by, Trooper Thomas Greeley followed it to Dracut, where it stopped at 83 Montaup Avenue. Osario attempted to enter the front door but was arrested. Officers secured the house and waited while Greeley applied for and obtained a search warrant. During their wait for the warrant, officers saw a man knock at the front door. Upon questioning, he told the police he was carrying $3,500 which he owed to Osario.

After his arrest and prior to the search of his residence, Osario was given his Miranda rights and agreed to answer questions put to him by two Lowell police officers. He told them that he lived at 83 Montaup Avenue in Dracut, that he had lived

---

[4]There was also evidence at the motion hearing that after Restrepo's arrest, the police searched his apartment with his wife's consent. There, they found about $6,500. The motion judge noted that Restrepo had waived any argument that that search was invalid.

there by himself for three years, and that he had gone home after talking to Restrepo at the J & P Appliance store.

On executing the warrant at Osario's residence, the police found approximately 2,300 grams of cocaine, a scale, 5.3 grams of marihuana,[5] $18,300 in cash, records, and drug-related paraphernalia.

2. *Compliance with G. L. c. 272, § 99.* Both at the hearing before the motion judge, and on appeal, the defendants claimed that the conditions of § 99 were not satisfied because the warrant for the wiring of Brathwaite did not set forth any facts to prove the statutory requirement that "normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried," see § 99 E 3,[6] and because the Commonwealth did not show the investigation was connected to organized crime.

The judge correctly rejected these arguments. The Commonwealth came within the exception of § 99 B 4 for conversations intercepted by law enforcement officers with the consent of one of the participants when investigating a designated offense "in connection with organized crime as defined in the preamble."[7] G. L. c. 272, § 99 B 7. See *Commonwealth* v. *Thorpe*, 384 Mass. 271, 275-276 (1981), cert. denied, 454 U.S. 1147 (1982). If the exception applies, the procedures and

---

[5]At trial, the judge excluded the marihuana from evidence as the indictments did not mention marihuana.

[6]All references to G. L. c. 272, § 99, are to St. 1968, c. 738, § 1, which amended § 99 in its entirety.

[7]In relevant part, G. L. c. 272, § 99 B 4, provides:

"[I]t shall not constitute an interception for an investigative or law enforcement officer . . . to record or transmit a wire or oral communication if the officer . . . has been given prior authorization to record or transmit the communication by . . . a party [to the conversation] and if recorded or transmitted in the course of an investigation of a *designated offense* as defined herein" (emphasis supplied).

A "designated offense" is defined in § 99 B 7, and includes a number of offenses "in connection with organized crime as defined in the preamble" to § 99, including "any offense involving the possession or sale of a narcotic or harmful drug."

The preamble, § 99 A, states, in part, that "[o]rganized crime, as it exists in the commonwealth today, consists of a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services."

requirements of G. L. c. 272, § 99, need not be met. *Commonwealth* v. *Penta*, 423 Mass. 546, 551-552 (1996).

Contrary to the defendants' contention, the judge was warranted in finding a nexus to organized crime. The Commonwealth is not "required to demonstrate probable cause of the existence of organized crime," *Commonwealth* v. *Thorpe*, 384 Mass. at 279, but rather is "required to show that the decision to intercept was made on the basis of a *reasonable suspicion* that interception would disclose or lead to evidence of a designated offense in connection with organized crime" (emphasis supplied). *Id.* at 281.

Sprague's affidavit in support of the warrant stated, inter alia, that Brathwaite had met and spoken with Zuluaga and that the latter had agreed to sell him a large quantity of cocaine, that someone else would bring the cocaine, that the cocaine "is the best thing in town" and that he, Zuluaga, "had not been getting any complaints." As an investigative officer involved in "hundreds of narcotic investigations," Sprague also stated, "it is my experience that persons involved in the distribution of kilogram and multi-kilogram quantities of cocaine necessarily conduct their activities in concert with others." Similar inferences as to organized crime are noted in our cases. See, e.g., *Commonwealth* v. *Thorpe*, 384 Mass. at 281 (nature of the crime involved may lend itself to the inference of "discipline and organization"); *Commonwealth* v. *Lykus*, 406 Mass. 135, 142 (1989).[8] See also *Commonwealth* v. *Price*, 408 Mass. 668, 671 n.2 (1990); *Commonwealth* v. *Penta*, 32 Mass. App. Ct. 36, 43 (1992), *S.C.*, 423 Mass. 546 (1996); *Commonwealth* v. *Eason*, 43 Mass. App. Ct. 114, 119-120, *S.C.*, 425 Mass. 1108 (1997),[9] cases indicating that the nexus with organized crime is met when a major drug sale is the subject of the investigation. The Commonwealth met its burden of showing a reasonable suspicion that interception would lead to evidence of a designated offense in connection with organized crime.

3. *Validity of the warrant for the wiring of Brathwaite.* The defendants contend that the motion judge erred in ruling that the warrant, issued under the common law authority of *Commonwealth* v. *Blood*, 400 Mass. 61 (1987), see *Commonwealth*

---

[8]See statutory description of organized crime in note 7, *supra.*

[9]In *Commonwealth* v. *Penta*, 423 Mass. at 551-552 n.9, the court declined to reconsider whether the statutory exception applied. That question had been decided by this court in a previous appeal. *Commonwealth* v. *Penta*, 32 Mass. App. Ct. at 43.

v. *Penta*, 423 Mass. at 552-553,[10] was supported by probable cause. Sprague's affidavit in furtherance of the warrant meets both the basis of knowledge and the veracity prongs required by *Commonwealth* v. *Upton*, 394 Mass. 363, 374 (1985), as set forth in *Aguilar* v. *Texas*, 378 U.S. 108 (1964), and *Spinelli* v. *United States*, 393 U.S. 410 (1969).

As to Brathwaite's basis of knowledge, Sprague's affidavit recited that Brathwaite reportedly had four conversations with Zuluaga. During one of the calls, Zuluaga indicated that he had agreed to sell Brathwaite two kilograms of cocaine. On Sprague's instructions, Brathwaite scheduled a meeting with Zuluaga, told Sprague when the meeting would take place, and Sprague observed the two men meet at the designated time. Thereafter, Brathwaite told Sprague that Zuluaga had agreed at that meeting to sell Brathwaite one kilogram of cocaine for $28,000. "In short" as the judge ruled, "Brathwaite had personal knowledge based upon his conversations and meetings with Zuluaga." See *Commonwealth* v. *Shea*, 28 Mass. App. Ct. 28, 30-31 (1989).

Although Brathwaite was a first-time informant whose veracity could not be established by past performance, there were sufficient indicia of his reliability to meet the veracity prong of *Commonwealth* v. *Upton*, 394 Mass. at 375. Brathwaite was not an anonymous informant. "Information provided by a named informant is generally accorded more weight." *Commonwealth* v. *Harding*, 27 Mass. App. Ct. 430, 434-435 (1989), quoting *Commonwealth* v. *Grzembski*, 393 Mass. 516, 522 (1984). His identification as the informant "strengthened his . . . credibility and 'carrie[d] with it indicia of reliability.' " *Commonwealth* v. *Bakoian*, 412 Mass. 295, 301 (1992), quoting *Commonwealth* v. *Atchue*, 393 Mass. 343, 347 (1984).

By agreeing to wear a body wire and personally arranging a drug purchase, Brathwaite, as the judge concluded, "put his credibility on the line." See *State* v. *Conant*, 139 N.H. 728, 731 (1995) (willingness to wear a body wire and personally arrange a drug purchase provided reason to believe informant). Brathwaite knew the police intended to act on his tip and would im-

---

[10]See also *Commonwealth* v. *Thorpe*, 384 Mass. at 286, where the court stated: "the better future course, and the most secure course constitutionally, is for law enforcement officials to procure warrants in cases where probable cause for surveillance can be shown, and even in cases where it does not appear that the statutes require a warrant."

mediately discover any lies. See *Hopkins* v. *State*, 524 So. 2d 1136, 1137 (Fla. Dist. Ct. App. 1988) (since informant was wired, he knew police would discover any lies). Cf. *United States* v. *Foree*, 43 F.3d 1572, 1576 (11th Cir. 1995) (veracity can be corroborated by creating circumstances under which informant is unlikely to lie, e.g., controlled surveillance by police).

The defendants argue that Brathwaite's veracity was diminished by the fact that he was paid. His payment, however, was not conditioned merely upon giving the police information. He was to be compensated only if his information led to arrests and seizure of drugs. In such circumstances, the promised payment may be viewed as more in the nature of a reward. See *People* v. *Stevens*, 98 Ill. App. 3d 158, 163 (1981), where the court pointed out:

> "[A] paid informer receives his money immediately upon his communication to the authorities. On the contrary, a reward recipient does not receive the stipulated monetary reward until after the validity and truth of his evidence have been tested and established . . . . There is a guarantee of establishment of the truth before payment is made."

In addition, while many of the facts corroborated by the police were public knowledge, Sprague ascertained that Brathwaite was indeed in contact with Zuluaga, a circumstance enhancing Brathwaite's credibility. See *United States* v. *Polus*, 516 F.2d 1290, 1292 (1st Cir. 1975); 2 LaFave, Search and Seizure § 3.3(f), at 174 & n.342 (3d ed. 1996). In sum, there were sufficient safeguards against fabrication to support the judge's conclusion that the veracity prong had been satisfied and there was probable cause to issue the warrant.

4. *Validity of the cellar search.* Although the judge originally allowed suppression of the kilogram of cocaine that the police had found in a desk drawer in the basement storage room in Lowell, the judge allowed the Commonwealth's motion for reconsideration of that decision and reversed his ruling. In its motion, the Commonwealth argued that on the facts previously found by the judge, the defendants had failed to meet their burden of showing that they had a reasonable expectation of privacy in the storage room. See *Commonwealth* v. *Montanez*, 410 Mass. 290, 303 (1991); *Commonwealth* v. *Carter*, 424

Mass. 409, 410-411 (1997). The judge agreed, and, citing to his earlier findings of facts, stated:

> "The evidence showed, and the court found, that the door between the travel agency and the Subway shop was open, that the door led to a stairway that descended to the basement of the building, and that adjacent to the stairway there was a small storage room whose door was partially open . . . . Additionally there was no evidence presented that any of the defendants owned or controlled access to the door, the stairway or the basement storage room in question."

In a footnote, citing to the Commonwealth's original memorandum in opposition to the motions to suppress, the judge added:

> "The court notes, however, that the Commonwealth may have lulled the defendants into the belief that their expectation of privacy in the basement storage room was not contested."

The defendants did not respond to the Commonwealth's motion for reconsideration until after the judge had acted. They then sought reconsideration and an evidentiary hearing, but made no offer of proof. Although the judge heard argument, he did not grant an evidentiary hearing. As the defendants made no offer of proof as to the factual basis for claiming privacy, the judge did not abuse his discretion in not granting such a hearing. While the defendants were understandably disappointed that the judge, on the Commonwealth's urging, had reconsidered a matter they had thought uncontested, they have shown no prejudicial unfairness or ineffectiveness of counsel on the record before us.[11]

The defendants also argue that the Commonwealth made

---

[11]Contrary to the defendants' contentions, the evidence at trial does not show that the defense could have established a reasonable expectation of privacy. See *Commonwealth* v. *Thomas*, 358 Mass. 771, 774 (1971); *Commonwealth* v. *Montanez*, 410 Mass. at 302. Zuluaga's testimony indicates that while there were keys to the outside doors to the basement, three commercial establishments and sixty-seven tenants had access and keys to these doors. Moreover, Zuluaga shared his storage area with a beauty salon and his office mate. He testified that numerous persons had keys to his storage area because the telephone box for the entire building was there as well as eight electricity

judicial admissions that Zuluaga had a privacy interest and is conclusively bound by them. It is doubtful that any of the statements in the Commonwealth's original opposition to the motions to suppress could be treated as judicial admissions, but even if they could, the motion judge did not abuse his discretion in relieving the Commonwealth of the consequences of having made them. *United States* v. *Belculfine*, 527 F.2d 941, 944-945 (1st Cir. 1975). While the Commonwealth at first relied on different reasons to oppose suppression, the motion judge acted within his discretion in reconsidering his ruling of law based on the newly raised theory. Neither Mass.R.Crim.P. 13(a)(2), 378 Mass. 871 (1979), providing that "[g]rounds not stated which reasonably could have been known at the time a motion is filed shall be deemed . . . waived," nor rule 13(a)(5), 378 Mass. 872 (1979), the rule governing motions for reconsideration, are to be administered so inflexibly as to preclude the correction of what a judge considers to be an erroneous ruling. See *Commonwealth* v. *Downs*, 31 Mass. App. Ct. 467, 470 (1991). See also *Peterson* v. *Hopson*, 306 Mass. 597, 601 (1940).

5. *Validity of the search of Osario's residence.* While Osario disputes the motion judge's finding that there was a sufficient nexus between the cocaine in the cellar and Osario's residence, the motion judge properly concluded that the affidavit in support of the warrant established probable cause for the search. We quote from the judge's memorandum:

> "In his affidavit, Greeley stated that after Zuluaga agreed to set up the deal with Brathwaite, and informed Brathwaite that he would have his supplier deliver the cocaine from the supplier's home, Zuluaga then met with Restrepo. Restrepo then proceeded to J & P Appliance and met with

---

meters. He said the door to the storage area was usually kept open. "[S]ometimes I would close it and find it open, and sometimes I would leave it open and find it closed. So it wasn't much use to use a key."

For the first time on appeal, the defendants argue that even if they had no privacy interest in the storage room, Zuluaga could have established a privacy interest in the desk in which the cocaine was found. The argument was not raised below and was not supported by an offer of proof. Moreover, Zuluaga's testimony at trial is not supportive of the claim. He testified that there were six desks in the room, three of them were his, two belonged to his office mate, and one belonged to his daughter. Although he testified that one of his desks was locked and was "very safe," there was no suggestion that the desk in which the drugs were found was locked.

Osario. After this meeting Osario headed toward Dracut. Osario subsequently informed Fernandez [officer who interviewed Osario after his arrest] that he went directly home after leaving J & P Appliance. Osario subsequently met Restrepo in the vicinity of the travel agency, picked him up in his truck, drove a short distance, and allowed Restrepo to exit the truck. The police observed Restrepo secrete a light colored package in his jacket. The pre-arranged deal then occurred and Brathwaite signaled the police. The police arrested Zuluaga and Restrepo. They found a . . . kilogram of cocaine in the adjacent room. These facts permit an inference that Osario got the cocaine from his residence, and demonstrate a sufficient nexus between his residence and the criminal activity to support a finding of probable cause."

## TRIAL.

We turn next to the errors claimed by the defendants relating to the trial. The Commonwealth's case at trial was substantially the same as at the hearings on the motion to suppress, except that Brathwaite's hearsay statements prior to being taped were not in evidence. We will mention additional evidence from the trial where needed.

6. *Motions for required findings of not guilty by Restrepo and Osario.* Looked at in the light most favorable to the Commonwealth, the evidence at trial warranted the jury's finding that the defendants were guilty beyond a reasonable doubt. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979). The jury were entitled to draw from the circumstances inferences which did not have to be necessary or inescapable so long as they were reasonable and possible. *Commonwealth* v. *Cohen*, 412 Mass. 375, 380 (1992). Also, the Commonwealth did not have to exclude every possibility as long as the record as a whole supports, as it does in this case, the conclusion of guilt beyond a reasonable doubt. *Ibid.*

Making arguments similar to those he made to contest the judge's finding of probable cause to search his residence, Osario claims the evidence at trial was insufficient to warrant a finding that he transferred the cocaine to Restrepo. Both he and Restrepo also argue that there was insufficient evidence that Restrepo transferred the cocaine to Zuluaga. Although the officers

did not see Osario hand the package to Restrepo, the inference was warranted that Osario was the source of Restrepo's package.[12] Prior to entering Osario's truck, Restrepo was under surveillance by five or six officers located in different positions. Very soon after he left the truck he was seen stowing a package under his jacket at an apartment complex on Archand Drive. The package was described at trial as "a foot by a foot" and "kind of a large package to be placing under his jacket." Restrepo was next observed walking from the end of Archand Drive to the agency, where he met with Zuluaga on the sidewalk. Both men then entered the doorway next to the agency, leading to the storage area. The description of the package hidden by Restrepo was consistent with the description of the package recovered from the desk in the Lowell basement. Based on this evidence, and the prior meetings of Restrepo with Zuluaga on April 3, the jury were warranted in concluding that Restrepo had actual or constructive possession of the drugs found in Lowell.[13] He concedes that if in this case the Commonwealth met its burden with respect to actual or constructive possession, it "necessarily satisfied the elements of joint venture." *Commonwealth* v. *Pichardo*, 38 Mass. App. Ct. 416, 417 n.2 (1995).

The jury were warranted in finding Osario guilty of trafficking in Dracut based on the drugs and drug paraphernalia found in his apartment. As stated earlier, the jury were also warranted in finding that Osario transferred the package to Restrepo and, hence, had had actual possession of the drugs. Osario, who was not tried as a joint venturer, but only as a principal, argues, however, that the judge's instructions on constructive posses-

---

[12]Because this inference was warranted, there was also probable cause for Osario's subsequent arrest.

[13]For the first time on appeal, Restrepo argues that the admission in evidence of the cash found in his residence created a substantial risk of a miscarriage of justice and only sent a message that he must have engaged in unrelated illegal conduct. Other inferences, however, were reasonable. There was evidence that Zuluaga stated to Brathwaite that "his guy" would come to the agency, count Brathwaite's money and take some of it with him. Zuluaga did not instruct Brathwaite to retrieve his money from the car until Restrepo was present, and the three men went to the basement together. In this context, it could be inferred that Restrepo was one of Zuluaga's "guys," that the cash in Restrepo's residence linked him to Zuluaga's drug distribution enterprise and dispelled any inference that he was only a small drug purchaser. In any event, if there was error in the admission of this evidence, there was not here a substantial risk of a miscarriage of justice.

sion permitted the jury to find him guilty on a theory other than actual possession — namely, that Osario constructively possessed the cocaine in Zuluaga's basement in Lowell. Since there was insufficient evidence that Osario had power or dominion over the drugs in the Lowell basement, the jury should not have been permitted to find him guilty on this basis. Massachusetts has not adopted the view in *Griffin* v. *United States*, 502 U.S. 46, 54-56 (1991), that jurors will have obviously rejected the theory for which there was no evidentiary support. Under our case law "there must be evidence to support each alternative theory submitted to the jury to uphold a general verdict of guilty" unless it is "apparent that the jury reached its general verdict necessarily and unavoidably on the theory for which there was evidentiary support." *Commonwealth* v. *Plunkett*, 422 Mass. 634, 638-639 & n.2 (1996). Accordingly, Osario is entitled to a new trial on the Lowell indictment.

7. *Brathwaite's confession.* Both the Commonwealth and the defense sought to call Kevin Brathwaite as a witness at trial. Citing his privilege under the Fifth Amendment to the United States Constitution, he refused to testify. At a voir dire, the prosecutor explained he wanted to inquire into Brathwaite's involvement with Zuluaga and his discussions with Trooper Sprague from the end of March through April 3, 1993. Defense counsel wanted to elicit from Brathwaite a description of events prior to March 30, 1993. He expected Brathwaite to testify that, instigated by certain members of the Lowell police department, Brathwaite had framed Zuluaga and had planted the cocaine in the desk drawer. Brathwaite had previously related this account to counsel for Zuluaga, counsel for Osario, and an investigator hired by Osario.

At the conclusion of the voir dire, the trial judge upheld Brathwaite's Fifth Amendment claim and declared the witness unavailable.[14] The defendants wanted to introduce in evidence Brathwaite's hearsay statement to the investigator under the authority of *Commonwealth* v. *Carr*, 373 Mass. 617, 623 (1977), and *Commonwealth* v. *Drew*, 397 Mass. 65, 73 (1986). Accord-

[14]Osario argues that there was error in allowing the privilege, citing *Commonwealth* v. *McMiller*, 29 Mass. App. Ct. 392, 408 (1990), as Brathwaite was acting with the encouragement and assent of the police. The argument is entirely without merit. There would be no protection for joining the police in illegally planting evidence. Cf. *Commonwealth* v. *Luna*, 418 Mass. 749, 753 (1994).

ingly, at a subsequent voir dire, the judge heard testimony from Osario's private investigator. The latter described what Brathwaite had told him on October 2, 1994, at the Nashua Street jail, an occasion when counsel for Osario and for Restrepo were also present. We set forth the investigator's testimony at the voir dire, narrating the account Brathwaite had given.

In 1993, Brathwaite was stopped by Lowell police for playing loud music in his car. A search uncovered traces of cocaine and also a telephone book with Zuluaga's telephone number. The officers — Brathwaite did not know their names — told him that they had been "looking at" Zuluaga for a long time because he had been "dealing drugs." If Brathwaite would help them "set up" Zuluaga, they would not prosecute him or send him back to prison. Brathwaite agreed, and the police then instructed him to call Trooper Sprague of the State police. He did so, but never told Sprague about his meeting with the Lowell police. He met with Zuluaga, initially to purchase restaurant equipment. At a second meeting, he indicated that he wanted to buy cocaine, but Zuluaga replied he did not deal in cocaine. Subsequently, the Lowell police — again he did not know which officers — gave him a bag of cocaine which he planted inside the desk drawer in the basement storage area.

In addition to hearing testimony from the investigator, the judge, at the same voir dire, heard testimony from Trooper Sprague who had spoken to Brathwaite at the Nashua Street jail on two occasions on October 3, 1994. This was the first scheduled day of trial and the day after Brathwaite had talked to the defendants' representatives. Brathwaite told Sprague on both occasions that he had not made a decision whether to testify. Sprague recounted: "And I discussed with him, or I mentioned to him that, both he and I understood what the truth was, and I expected him to tell the truth." Sprague testified that Brathwaite's response was, "He said that he would." Sprague also testified:

> "And then, after we finished that brief conversation about the truth, I said 'Is there something going on here Kevin that I'm not aware of?' And he said, 'No.' I said, 'You're sure there's nothing that I should know about that I don't know about.' And he told me there was not."

The judge excluded the investigator's testimony.

The defendants claim error because the judge failed to comply with the requirements of *Commonwealth* v. *Drew*, 397 Mass. 65 (1986), and *Commonwealth* v. *Galloway*, 404 Mass. 204 (1989). In order to admit a statement against interest under these cases, and Rule 804(b)(3)[15] of the Federal Rules of Evidence, adopted by the Supreme Judicial Court in *Commonwealth* v. *Carr*, 373 Mass. at 623, the statement must meet three tests:

> " '[1][T]he declarant's testimony must be unavailable; [2] the statement must so far tend to subject the declarant to criminal liability 'that a reasonable man in his position would not have made the statement unless he believed it to be true'; and [3] the statement, if offered to exculpate the accused, must be corroborated by circumstances clearly indicating its trustworthiness.' *United States* v. *Thomas*, 571 F.2d 285, 288 (5th Cir. 1978). See Proposed Mass. R.Evid. 804(b)(3)."

*Commonwealth* v. *Drew*, 397 Mass. at 73. The judge acknowledged that the first two tests were met but found there was insufficient corroboration to indicate that Brathwaite's statements to the investigator (and counsel) were trustworthy.

In describing the requirements for finding corroborating circumstances for the statement to be trustworthy, the court in *Drew* set forth the following guidelines: "The judge should assess 'both the credibility of the declarant and the credibility and the probativity of his statement,' " (citation omitted), 397 Mass. at 75, but not the credibility of the witness. *Id.* at 76. The judge should not require that the statement be actually true, but rather, should inquire

> "whether, in light of the other evidence already adduced or to be adduced, there is some reasonable likelihood that

[15]Federal Rule 804(b)(3) provides: "(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: . . . (3) Statement against interest. — A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

the statement could be true. Other factors the judge may consider are: the timing of the declaration and the relationship between the declarant and the witness . . . the reliability and character of the declarant . . . whether the statement was made spontaneously . . . whether other people heard the out-of-court statement . . . whether there is any apparent motive for the declarant to misrepresent the matter, and whether and in what circumstances the statement was repeated . . ." (citations omitted).

*Ibid.*

In reaching his conclusion, the judge recognized that there was some evidence challenging a few of the statements made earlier by Brathwaite to Trooper Sprague and incorporated in the latter's affidavit in support of the warrant for the body wire.[16] His careful review of Brathwaite's statements to the investigator in light of the *Drew* factors, however, left him unconvinced that they were trustworthy. He discounted the testimony of Zuluaga and of his friend (see note 16, *supra*) as not being from disinterested persons. He noted that Brathwaite sat on the information for a long period of time during which, according to his account, innocent defendants were in jail awaiting trial. Not until he was advised that he would be a witness did he give the new version, and then he gave it to representatives of the persons whom he had caused to be incarcerated. At the time of his new statements, Brathwaite was in jail. As an incarcerated inmate, he could feel vulnerable to retaliation from people who were similarly situated, not necessarily the defendants, but others who were in prison with him. Moreover, Braithwaite's character and his actions in court militated against the reliability of his statements. The judge noted that Brathwaite had been convicted of a crime, that on one day he had told the court that

---

[16]Sprague's affidavit in support of the body wire stated that Brathwaite had told him that at M.C.I., Gardner, he had become friendly with Yassar Funez, the brother of Luis (Zuluaga), and that he had met Luis twice at the institution. Funez, a longstanding friend of Zuluaga, testified, however, that Zuluaga never came to M.C.I., Gardner, that he did not introduce Brathwaite to Zuluaga, and that he was not related to Zuluaga.

There was also evidence that although Sprague had told Brathwaite not to take the gym bag in which the cash was located into the cellar, Brathwaite took the bag to the cellar. This act, the defendants argue, enabled Brathwaite to carry the drugs and plant them in the cellar.

he was not going to exercise his Fifth Amendment rights and then, two days later, changed his mind. If his out-of-court statement was true, he acknowledged being part of a previous lie resulting in the incarceration of innocent individuals. Although Brathwaite on his own came to the defendants' representatives, he, in effect, recanted his statements when Trooper Sprague visited him the next day. Most significant, in the judge's opinion, was the fact that Brathwaite had a motive to fabricate. He had expected the government would pay him $1,000 and send him on his way. Instead he was still incarcerated. Knowing the position of a so-called "rat" in a penal institution, he had every motive not to testify for the government and to testify in favor of the defendants to exonerate himself in the eyes of his fellow inmates.

The judge's findings are persuasive, show the exercise of "discriminating judgment," see *Commonwealth* v. *Carr*, 373 Mass. at 624, and amply support the conclusion that there was insufficient corroboration to indicate that Brathwaite's statements were trustworthy. In addition, we note that Brathwaite's allegations did not implicate any specific policemen and only vaguely referred to "Lowell police."

The defendants' argument that the judge used the wrong standard when he said, "the role of the court is not to determine whether the statements are actually true, but whether there's a reasonable likelihood that they're true" is a misleading emphasis on words.[17] The judge's findings complied with the *Drew* standard.[18] Contrary to their contentions, the defendants have also not shown that their cases present "the type of rare and unique circumstances in which the exclusion of evidence under hearsay rules defeats the ends of justice and thereby violates the due process clause. *Green* v. *Georgia* [442 U.S. 95], 97 [1979].

[17]As indicated earlier, *Drew*, 397 Mass. at 76, used the words "some reasonable likelihood that the statement *could* be true" (emphasis supplied).

[18]Since a greater degree of improbability or untrustworthiness must be found to reject a claim of the privilege against self-incrimination than to find a statement uncorroborated "by circumstances clearly indicating its trustworthiness," there is no inconsistency in the judge's acceptance of Brathwaite's invocation of the privilege and his determination that Brathwaite's statements were not sufficiently trustworthy to be admissible. Compare what is required by *Drew* and Fed. R. Evid. 804(b)(3), see notes 15 and 17, and text at 643-645 *supra*, with *Commonwealth* v. *Martin*, 423 Mass. 496, 502 (1996) (witness may refuse to testify unless perfectly clear that answer cannot possibly have tendency to incriminate).

*Chambers* v. *Mississippi*, [410 U.S. 284], 302 [1973]" (footnote omitted). *Drew, supra* at 72 & n.6.

8. *Claims concerning Officer Fernandez's testimony.* At the pretrial hearing, when asked by Osario's attorney, whether she or Osario had terminated the questioning at the police station, Officer Fernandez answered, "I believe we did." At trial, however, she stated that the interrogation ended when "Mr. Osario stated that he didn't want to answer any more questions." Osario claims that the Commonwealth suborned false pretrial testimony from Fernandez. The claim is not borne out on the record. That a prosecution witness contradicted herself is insufficient to show that the Commonwealth knowingly used perjured testimony. See *Commonwealth* v. *Daigle*, 379 Mass. 541, 546-547 (1980).

Osario's further contention that his counsel was ineffective in not seeking remedial action concerning his constitutional right to remain silent is without merit. The judge specifically asked counsel whether he wanted him to say anything to the jury. Counsel replied that he did not. Counsel's tactical decision not to emphasize Osario's invocation of his Fifth Amendment rights was not "manifestly unreasonable." See *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978); *Commonwealth* v. *Haley*, 413 Mass. 770, 777-778 (1992). Counsel's failure to seek a mistrial is of no consequence. We have no doubt that any such request would have been denied. See *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974) (defendant must show that counsel "likely deprived the defendant of an otherwise available, substantial ground of defence").

9. *Prosecutor's closing argument.* In his closing argument, Zuluaga's counsel argued that there could "be no other conclusion other than there wasn't any drug deal and Luis Zuluaga was set up." He also "suggest[ed] that the Lowell Police had contact with Brathwaite prior to his contacting Sprague so the Lowell police would not be involved and could assist Brathwaite in setting up Luis Zuluaga. It was all part of that frame-up." Restrepo's counsel also implied that the police lied and that Brathwaite could have put the drugs in the cellar. In response, the prosecutor in his closing stated:

> "There is not one shred of evidence that you could conclude that that cocaine was actually planted. Not one witness took the stand here today and told you that that cocaine was planted.

> "`. . . .`
>
> "They would have you believe that he had some kind of plant in there [the bag Brathwaite took to the basement]. Well, we haven't heard any evidence that Mr. Brathwaite planted anything."

Relying on *Commonwealth* v. *Mosby*, 11 Mass. App. Ct. 1, 8-9 (1980), the defendants claim that the prosecutor unfairly exploited the absence of evidence he had succeeded in excluding. See also Smith, Criminal Practice and Procedure § 1866 (2d ed. 1983 & Supp. 1997). While defense counsel now consider themselves trumped, they made no objection at trial, thus suggesting that the unfairness was not obvious at the time. "The absence of objection by defense counsel during or after argument may provide some guidance as to whether a particular argument was prejudicial in the circumstances." *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 n.8 (1987). "This is especially true, where, as here, contemporaneous objections were made to the prosecutor's summation." *Commonwealth* v. *Walker*, 421 Mass. 90, 104 (1995). See Smith, *supra* § 1855 (Supp. 1997), and cases cited. Here the defendants' arguments, at least that of Zuluaga, proffered the theory that there was a frame-up. Unlike the situation in *Commonwealth* v. *Mosby, supra*, the prosecutor was trying to counter counsel's argument. Moreover, unlike the argument in *Mosby, supra* at 7, the prosecutor here did not misstate the evidence, the matter did not involve the defendants' right to remain silent, and the evidence was excluded by the judge to protect against the introduction of fabricated evidence. *Commonwealth* v. *Drew*, 397 Mass. at 75. In any event, there was no substantial risk of a miscarriage of justice in view of the strength of the evidence at trial and the untrustworthiness of the evidence excluded.

The defendants also claim that the prosecutor engaged in inflammatory comment and vouched for the police. The prosecutor argued the veracity of the police version of the events of the investigation, and elaborated:

> "[A]ll these [Lowell] officers, they're going to put their careers at risk. They're going to put their reputations at risk. They're going to put their livelihoods at stake [by framing Zuluaga] . . . . That is absolutely ridiculous. Think about it.

"....

> "You know, ladies and gentlemen, I suggest to you in this case, although, cop bashing certainly is in vogue today, that the police here did nothing wrong. As a matter of fact, they did an outstanding job I would suggest to you to have this videotaped, and to have a real-life kilogram deal on tape, both audio and visually. They have nothing to hide, ladies and gentlemen."

At the close of the prosecutor's argument, the defendants, among other objections, complained that the prosecutor by calling the defendants' account "unbelievable" inserted his own opinion as to the credibility of the defense theory or their witnesses.[19] See *Commonwealth* v. *Delrio*, 22 Mass. App. Ct. 712, 720 (1986). In response, the judge indicated he would give the curative instructions set forth in the margin.[20] Counsel for Zuluaga said, "That sounds good," but counsel for the others said, "Could it [be] more directed to [the prosecutor] because I don't believe any of us made those characterizations." The judge thought not, saying the purpose of the instruction is not to single out for punishment, but rather to insure that the jury not misuse the argument.

Counsel made no further objection and did not object after the curative instruction was given. In these circumstances the objection was not sufficiently preserved. To the extent that the prosecutor's comments were inappropriate, see *Commonwealth*

---

[19]Unlike the claims made on appeal, at trial counsel only asserted the claim that the prosecutor improperly gave his own opinion as to credibility.

[20]"[Final arguments] don't constitute evidence. They're an effort by counsel to marshal the evidence in a way ·which they hope will be persuasive to you of their particular client's point of view. Whether the client be an individual or the Commonwealth. In that regard, the attorneys are acting as advocates, arguing for a point of view.

"Sometimes during argument counsel say things like 'I believe' or 'I think this is true,' or they may make other characterizations concerning the quality of the evidence one way or the other. When they do that, they're not expressing their personal view as to the credibility of a witness or the quality of the evidence, they are arguing the point of view of their respective clients. And you should take it in that light. The lawyers in this case are not permitted to argue their personal view, to the extent they may have one, and they aren't doing that even in circumstances where rhetorically it may appear that that's true."

v. *Lopez*, 31 Mass. App. Ct. 547, 552-553 (1991), the judge's curative instruction sufficiently mitigated the harm, see *Commonwealth* v. *Kozec*, 399 Mass. at 518, and in any event there was no substantial risk of a miscarriage of justice.

The remaining claims of the defendants either need not be considered in view of our decisions concerning other issues or are without merit.

Osario's conviction on the Lowell indictment (No. 93-681-001) is reversed, and that verdict is set aside. The other judgments are affirmed.

*So ordered.*