## Commonwealth vs. Richard J. Urkiel.

No. 03-P-1402.

Franklin. September 14, 2004. - May 6, 2005.

Present: Kantrowitz, Kaplan, & Mills, JJ.

*Resisting Arrest. Self-Defense. Evidence,* Self-defense. *Practice, Criminal,* Trial jury-waived. *Police Officer.*

At the trial of a criminal complaint alleging that the defendant had unlawfully resisted arrest, in violation of G. L. c. 268, § 32B, the judge properly denied the defendant's motion for a required finding of not guilty made at the close of the Commonwealth's case, where the fact that the police officer making the arrest made a constitutionally invalid warrantless entry into the defendant's home to effect the arrest did not by itself constitute unreasonable force so as to permit the defendant to resist arrest. [447-448]
At the jury-waived trial of a criminal complaint alleging that the defendant had unlawfully resisted arrest, in violation of G. L. c. 268, § 32B, the judge committed prejudicial error requiring a new trial when he expressly declined self-instruction on the defendant's claim of self-defense, given that the evidence would support a reasonable doubt as to whether the prerequisites of self-defense were present. [450-452]
Discussion of an issue that could recur at the retrial of a criminal complaint alleging that the defendant had unlawfully resisted arrest, in violation of G. L. c. 268, § 32B, concerning the possibility that the police officers effecting the defendant's arrest were not acting under color of their official capacity in doing so. [452-454]

Complaint received and sworn to in the Greenfield Division of the District Court Department on June 19, 2002.

The case was heard by *Jacques Leroy*, J.

*Adriana Contartese* (*Dana Alan Curhan* with her) for the defendant.

*Judith Ellen Pietras*, Assistant District Attorney, for the Commonwealth.

Kaplan, J. A judge of the District Court found at a bench trial that the defendant, Richard J. Urkiel, had unlawfully resisted arrest by certain police officers of the town of Greenfield (G. L.

c. 268, § 32B), but had not committed assault and battery upon those officers (G. L. c. 265, § 13D).[1] We reverse the judgment of conviction and remand for a new trial, because of the judge's handling of the issue, tendered by the defendant, of self-defense against excessive force used by the officers. We discuss, further, a matter that may arise upon the retrial in the application of the resisting arrest statute.

1. Sergeant Daniel McCarthy was the Commonwealth's sole witness. McCarthy testified thus:

About 6:55 P.M. on June 18, 2002, McCarthy went to Lunt Field, a local little league baseball field, on a report that the defendant was present there in violation of a provision of a restraining order against him in favor of his ex-wife, Gail, forbidding either party to attend their children's sporting events when the children were at the time under the other's care.[2]

Arriving at the field, Sergeant McCarthy learned from Gail that the defendant had driven up in a green pickup truck, remained in the vehicle for approximately five to ten minutes, and driven away. He had called one of their children over to the truck and talked with him for a few moments before the boy returned to his baseball game. The defendant did not communicate with Gail or threaten her in any sense. Gail rather said that Richard was not supposed to be at the field and she could not teach the children respect for law if he did not himself respect it.

Around 7:10 P.M., McCarthy alerted all units by bulletin to be on the lookout for the defendant and his vehicle. Then he drove to the defendant's known residence at 280 Chapman Street in Greenfield. Officer Rice separately arrived there. The officers identified the defendant's truck, the engine and tail pipe still warm, in the backyard. They knocked to no response on the front and back doors of the house; both doors were locked. Detecting no activity within the house, the officers left the place at 7:20 P.M. Sergeant McCarthy filed a report which stated,

---

[1]Violation of a provision of a G. L. c. 209A restraining order was also charged, to which the defendant pleaded guilty.

[2]This provision of the restraining order has since expired. Gail Urkiel stated at the sentencing phase that there could be mutual attendance so long as the parents kept apart.

"Other checks will be made at this house for Richard. If unable to locate him a warrant will be applied for."

Some three hours later at 10:00 P.M., McCarthy, with an Officer Greene, returned to the residence for the purpose of arresting the defendant for the restraining order violation (a misdemeanor). Neither officer had sought a warrant. The defendant was sleeping on a couch downstairs. Circling the house in opposite directions, the officers heard the defendant snoring. As they met near the back door, Greene told McCarthy he had awakened the defendant by calling to him through an open window; now the defendant was coming to the front door.

The defendant opened the solid wooden front door and talked to the officers through the unlocked screen door.[3] The officers said the defendant was under arrest on account of violating the restraining order. In response, the defendant "basically said 'so?' " and that he "wasn't going to be arrested." He began to push the front door closed. McCarthy opened the screen door and thrust his hand inside the front door to hold it open. The defendant grabbed McCarthy's wrist. McCarthy grabbed the defendant's hand. The defendant pulled McCarthy through the doorway.

According to McCarthy, the defendant attacked him, seized him in a bear hug, lifted him up by the waist, and slammed him into the open front door, thus breaking a pane of decorative glass in its center. In violent struggle, the defendant tackled, pushed, and repeatedly struck both McCarthy and Greene; during the skirmish, McCarthy was thrown into a coat rack just inside the doorway. It took the assistance of Officer Rice, timely arriving, and multiple uses of OC spray[4] to subdue the defendant. After he was restrained on the porch in a prone position, he continued to try to pull away and hid his arms underneath his body to prevent handcuffing. The officers soon completed the arrest.

2. As McCarthy ended his testimony, the defendant moved

---

[3]The defendant says the screen door was locked.

[4]OC (oleoresin capsicum) is commonly known as pepper spray and, in its more potent forms, is widely used by police as a non-lethal weapon. Orange in color (due to the use of cayenne pepper), it is considered highly effective and potentially dangerous.

for a required finding of not guilty. Under the resisting arrest statute and general law, a person has a right to resist by reasonable force an arrest carried out by police with excessive or unreasonable force, see G. L. c. 268, § 32B; *Commonwealth* v. *Moreira*, 388 Mass. 596, 601-602 (1983), and this permitted exercise of self-defense does not turn upon the legality or illegality of the arrest itself, see *id.* at 601. In the present case the Commonwealth conceded the constitutional invalidity of the warrantless entry and, therefore, of the arrest.[5] The defendant went on to argue that this invalidity — simpliciter, without more — should count as unreasonable force, justifying forceful resistance. However, the cases are distinct, not analogous, and the right now claimed by the defendant was repudiated in *Commonwealth* v. *Gomes*, 59 Mass. App. Ct. 332, 340-343 (2003). The judge was right to deny the defendant's motion. But defendant's counsel remarked that the question of resistance to the police behavior in its entirety would come up when all the evidence was in.

3. The defendant, the sole defense witness, essentially confirmed McCarthy's story about the incident at the field except that the defendant had all three children running over to the car without being called. After leaving the field, the defendant ran two brief errands (to a gym to place a medical hold on his membership, and to a friend's house to drop a video game in the mailbox). He returned to 280 Chapman. He was recovering from a spinal tap procedure undergone the night before. He took a bath upstairs followed by a nap in an upstairs bedroom.

About 9:45 P.M., the defendant went downstairs to the kitchen for a drink of water and an ice pack for his back. Then he lay down on a couch and fell back asleep. A few minutes later, he awoke to the officers yelling through the window. McCarthy said the police were there to talk to him. He answered, "The window's open, talk." McCarthy demanded that he come to the

---

[5]A person may be arrested, without a warrant, upon probable cause to believe he or she has committed a felony. However, in the absence of exigent circumstances, warrantless entry makes the arrest unlawful. *Commonwealth* v. *Forde*, 367 Mass. 798, 803-807 (1975). *Commonwealth* v. *Marquez*, 434 Mass. 370, 374-376 (2001). Warrant requirements for entry and arrest in misdemeanor cases are more stringent; see, however, note 12, *infra*, regarding arrests for certain violations of restraining orders.

door to talk face-to-face. The defendant responded, "I'm on doctor's orders to lay on this ice pack on this couch, come back tomorrow morning." McCarthy, in an angry tone, insisted that he come to the door immediately. Despite pain from the spinal tap, the defendant got up and complied.

The defendant testified that the officers never told him of their purpose to arrest him. As the defendant opened the front door inward, McCarthy, without a word, rushed at him — breaking through the screen door, which had been locked,[6] and sending splinters of wood flying. Fearful for his safety, the defendant tried quickly to resist and close the wooden door. When the door was almost shut, McCarthy punched through a decorative glass panel at the center to force the door open. The defendant continued to try to push the door closed, while McCarthy used all his weight to keep it open. After about two seconds, the defendant was overcome, releasing the door. It flung inward, smashing into his bare right big toe, peeling the nail back with blood. McCarthy was self-propelled inside the house and into a coat rack. McCarthy jumped to his feet and attacked the defendant, repeatedly punching him on the side of his head and right arm, which the defendant raised to protect himself. The defendant pleaded for McCarthy to stop. He protested he was in great pain from the spinal tap. In ten to fifteen seconds Officer Greene appeared. At McCarthy's command, Greene sprayed the defendant with OC spray in the eyes and mouth; the defendant testified he felt "the worst, hottest pain in my eyes that I've ever felt in my life and a taste that is so horrible in my mouth that I will never ever wish that on anyone." As McCarthy continued to throw punches, the officers grabbed the defendant and shoved him onto the front porch. They instructed him to put his arms to his sides and get down on the porch. The defendant relaxed his arms but said he could not bend his back because of the spinal tap.

Now Officer Rice appeared. At McCarthy's command, "Spray him again," Greene and Rice did so until the OC dripped onto the defendant's shirt and the floor boards of the porch. The officers combined to take the defendant's legs out from under him, slamming his chin on the porch. McCarthy twice jumped

---

[6]McCarthy testified it was unlocked, cf. note 3, *supra.*

on the defendant, plunging his knee into the defendant's neck and back. The defendant's cries caused his neighbors' lights to go on through the vicinity.

Handcuffed, the defendant was placed in a patrol car and taken to the police station. Because of the effects of the OC spray, the defendant could not open his eyes through the booking process and is pictured in a dazed, pained squint. Shortly he complained of severe pain throughout his body, especially in his back. He requested medical attention and was taken to the hospital, where he was x-rayed, received treatment for his injured big toe, and was released, returning to the station at 2:30 A.M. The following morning, at the suggestion of court house personnel, the defendant was returned to the hospital for examination and treatment.

4. In his closing argument, defense counsel persisted in his position that the defendant acted in self-defense, responding to excessive and unreasonable force on the part of the officers in effecting the arrest. As already indicated, the judge was right to reject the defendant's suggestion — that an unlawful, unconstitutional entry into a dwelling could itself constitute the excessive force giving rise to the right to resistance. However, the judge never deliberately addressed the proposition that the defendant's self-defense claim attached to more than the entry and encompassed the physical force applied to his person — the real gravamen. The judge refused to accept for his own guidance a general instruction on self-defense, remarking that to raise the issue would "confuse the Court more than the instructions already confused everybody." The judge did not indicate he had considered the broader self-defense issue (or other dimensions of the resisting-arrest statute). He said merely that he did not "buy the self-defense business" because he did not believe the defense's "allegation that a violation of constitutional right is such violence as to trigger the right of self-defense."

The judge's confinement of his attention to the defendant's earlier argument is puzzling because of his reactions to the testimony on both sides.[7] The judge said the defendant had been informed that the officers were at his home to arrest him and

[7]The judge did not make formal findings of fact, see *Stella* v. *Curtis*, 348 Mass. 458, 461 (1965), and such views as he expressed were fragmented.

that he resisted the arrest. The judge also stated that he found "some of the defendant's testimony extraordinarily credible because the determination of the police to effect the arrest at all cost is obvious."[8] He characterized McCarthy's testimony as "by necessity" containing "self-serving" elements. He evidently discredited McCarthy's testimony — implausible on its face — that the defendant deliberately seized him and drew him into the house at the same time he was trying to push the wooden door closed. In the ordinary course, one would expect the judge to have weighed the evidence on the self-defense proposition which surely was not one-sided. There is no indication that he did so as he rejected the proposition altogether. This was prejudicial error calling for a new trial. See *Commonwealth* v. *Graham*, 62 Mass. App. Ct. 642, 651-654 (2004).

In a bench trial, we start by assuming that the judge has "correctly instructed himself as to the manner in which the evidence is to be considered in his role as factfinder." *Commonwealth* v. *Batista*, 53 Mass. App. Ct. 642, 648 (2002). But the assumption fades where the record indicates otherwise (*ibid.*), as in *Commonwealth* v. *Darby*, 37 Mass. App. Ct. 650, 655-656 (1994). In the present instance the judge expressly declined vital self-instruction.

The defendant was entitled to the judge's consideration of an implicit self-defense instruction "if any view of the evidence would support a reasonable doubt as to whether," taking all reasonable inferences in his favor, "the prerequisites of self-defense were present," "to wit: (1) the defendant had 'a reasonable concern over his personal safety' [based upon the officers' use of unreasonable or excessive force]; (2) he used all reasonable means to avoid physical combat; and (3) the degree of force used was reasonable in the circumstances, with proportion-

---

[8]During sentencing, the judge appeared to attribute the officer's harsh behavior to the defendant's "wising off" in the exchange at the open window. In his testimony, the defendant intimated another ground of McCarthy's conduct. As a certified construction inspector and field engineer, the defendant had supervised the construction of a road interchange in the locality. The defendant had dealt with McCarthy protesting the fact that the town police had been overlooked in favor of the State police in the handout of the oversight of traffic detail at the project. (It appears the local police ultimately got part of the work.)

ality being the touchstone for assessing reasonableness" (citations omitted). *Commonwealth* v. *Franchino*, 61 Mass. App. Ct. 367, 368-369 (2004). See *Commonwealth* v. *Graham*, 62 Mass. App. Ct. at 651-654. The defendant's acquittal of the charges of assault and battery on the officers is consistent with the claim and use of self-defense, for it would be incongruous to hold the defendant to the assault and battery offenses while he was doing no more than resisting the officers' force with only proportionate force.[9] See *Commonwealth* v. *Correira*, 50 Mass. App. Ct. 455, 456-457 (2000), on "intent" in relation to assault and battery.[10]

To conclude, the judge as fact finder should have been guided by an instruction as in *Commonwealth* v. *Graham*, 62 Mass. App. Ct. at 654 n.7:

> "The gist of the instruction would provide as follows: If there is evidence of excessive or unnecessary force by police in making an arrest, the Commonwealth must prove beyond a reasonable doubt (1) that the arresting officer did not use excessive or unnecessary force in making the arrest. If the Commonwealth satisfies this burden, then the defendant has no right to engage in self-defense. If the Commonwealth fails to prove that excessive or unnecessary force was not used by police, and there is evidence of self-defense, then the Commonwealth must prove beyond a reasonable doubt (2) that the defendant did not act in self-defense, or (3) that force used by the defendant in self-defense was unreasonable or excessive in the circumstances. See *Commonwealth* v. *Kendrick*, 351 Mass. 203, 211 (1966); *Commonwealth* v. *Rodriguez*, 370 Mass. [684,] 692 n.10 [(1976)]."

5. We venture some remarks about an issue that was brushed over during the trial, but may recur at the new trial.

---

[9]Where the judge said, "whatever contact occurred in the course of the altercation between the police and the defendant was accidental and not intentional," he was not suggesting that the officers were innocent of using excessive force; seemingly he was referring to the defendant's innocence of the assault and battery complaint as observed in our text above.

[10]The "reckless" definition of assault and battery was not at issue in the case.

One portion of the resisting arrest statute deals with the party's right to self-defense in the face of excessive force on the part of the police — we have dealt with this *supra*. In another portion, a special provision makes its appearance. Its operative effect is that, in general, for the Commonwealth to make a case against alleged illegal resistance to arrest, it is bound to establish (beyond a reasonable doubt) that the officers acted "under color of [their] official capacity" in attempting the arrest — that is, they were "called upon to make, and [did] make, a judgment in good faith based upon surrounding facts and circumstances that an arrest should be made by [them]." The special provision — part of G. L. c. 268, § 32B, inserted by St. 1995, c. 276 (reproduced in the Appendix) — is a compromise of two views: (i) the person arrested has no right to resist the arrest even if illegal, (ii) he has a right to resist (proportionately) an illegal arrest. South Dakota and Colorado have such compromise legislation (see S.D. Codified Laws §§ 22-11-4, 22-11-5 [1998]; Colo. Rev. Stat. Ann. §. 18-8-103 [West 2004])[11]; ours is evidently modeled on Colorado's.

Lack of good faith is possibly discernible in the conduct of McCarthy (and associates). He wrote in his report that if he could not find Urkiel (and presumably induce him to answer voluntarily to the violation) he would seek a warrant. This exhibited a befitting awareness of elementary law. However, when the parleying between McCarthy and Urkiel ended abruptly at 280 Chapman, the officers overlooked any warrant and entered and arrested illegally. The knowing breach was egregious for being unnecessary, considering Urkiel's residency and evident accessibility, not to speak of the size and nature of the violation.[12]

Answering the defendant's possible good faith point, the

[11]See *People* v. *Hess*, 687 P.2d 443, 447-448 (Colo. 1984); *People* v. *Mason*, 632 P.2d 616, 617 (Colo. App. Ct. 1981), both finding sufficient evidence of good faith to support a conviction.

[12]Of possible interest on police motivation is an exception to the usual warrant requirement in misdemeanor arrests that emerges in cases of restraining order violations. See G. L. c. 276, § 28; G. L. c. 209A, § 6(7). But § 6, under the heading "abuse prevention," appears to confine the power of arrest to situations where the officer "has reason to believe that a family or household member has been abused or is in danger of being abused." Broad reading of the statute might derogate from the traditional limitations on power of entry

Commonwealth is likely to point to a colloquy during trial during which defense counsel said, "They say, if he was acting under color of his official authority. No doubt about it, he thought he could do this. He was wearing a full uniform." This, the Commonwealth may say, is an abandonment of the lack of good faith claim and it cannot be revived at retrial. In context, it is dubious whether the speech was made more than arguendo. The relatively small attention the defendant paid to the point seems explained by the fact that he was defending against the assault and battery charges as well as the resistance charge; good faith was not applicable to the assault, and convenience and force of argument drew counsel to making a single attack on all the charges. However all this may be, commonly at retrial the slate is clear; changes of position are matter of course. See *Commonwealth* v. *Arsenault*, 361 Mass. 287, 298 (1972); *Commonwealth* v. *Hardy*, 6 Mass. App. Ct. 892 (1978).[13] On occasion, argument revolves about characterizations of statements at trial as "concessions" or "judicial admissions," see *Commonwealth* v. *Arsenault, supra* at 298, citing *Household Fuel Corp.* v. *Hamacher*, 331 Mass. 653, 657 (1954),[14] but at all events residual judicial discretion remains whether to allow the divergence from the pattern at trial. See *Household Fuel Corp.* v. *Hamacher*, 331 Mass. at 657; *Commonwealth* v. *Sanchez*, 405 Mass. 369, 377 (1989); *Commonwealth* v. *Zuluaga*, 43 Mass. App. Ct. 629, 638 (1997). Here, upholding the policy of the special legislation might also figure in decision.

*Judgment reversed.*

---

and arrest applying to misdemeanors. At all events, the Commonwealth concedes there were no exigent circumstances in the present case justifying the entry.

[13]See also *Miller* v. *State*, 955 P.2d 892, 896 (Wyo. 1998) (collecting cases).

[14]See also 9 Wigmore, Evidence § 2593 (Chadbourn rev. ed. 1981); *United States* v. *McKeon*, 738 F.2d 26, 30-33 (2d Cir. 1984).

APPENDIX.

G. L. c. 268, § 32B. Resisting arrest.

"(a) A person commits the crime of resisting arrest if he knowingly prevents or attempts to prevent a police officer, acting under color of his official authority, from effecting an arrest of the actor or another, by:

"(1) using or threatening to use physical force or violence against the police officer or another; or

"(2) using any other means which creates a substantial risk of causing bodily injury to such police officer or another.

"(b) It shall not be a defense to a prosecution under this section that the police officer was attempting to make an arrest which was unlawful, if he was acting under color of his official authority, and in attempting to make the arrest he was not resorting to unreasonable or excessive force giving rise to the right of self-defense. A police officer acts under the color of his official authority when, in the regular course of assigned duties, he is called upon to make, and does make, a judgment in good faith based upon surrounding facts and circumstances that an arrest should be made by him.

"(c) The term "police officer" as used in this section shall mean a police officer in uniform or, if out of uniform, one who has identified himself by exhibiting his credentials as such police officer while attempting such arrest.

"(d) Whoever violates this section shall be punished by imprisonment in a jail or house of correction for not more than two and one-half years or a fine of not more than five hundred dollars, or both."