## Commonwealth vs. J. Garrett Terzian.

No. 03-P-139.

Plymouth. February 12, 2004. - August 31, 2004.

Present: Cypher, Kantrowitz, & Berry, JJ.

*Subornation of Perjury. Intimidation of Witness. Witness,* Intimidation. *Electronic Surveillance. Search and Seizure,* Electronic surveillance.

The affidavit accompanying an application for a search warrant met all of the requirements for the one-party consent exception to the proscription in G. L. c. 272, § 99, of the secret transmission or recording of oral communications, where the affidavit established not only that one party had consented to the interception of specific communications and that the investigation at issue (concerning an attorney's alleged attempt to procure another to commit perjury and to intimidate a witness) was of a "designated offense" as defined in § 99 B 7, but also that the designated offense was connected to organized crime, in that the evidence presented in the affidavit permitted a judge to infer that a certain level of organization, planning, and discipline were required to fabricate and coordinate testimony and that a continuing conspiracy designed to intimidate a witness and suborn perjury existed. [743-746]

INDICTMENTS found and returned in the Superior Court Department on December 18, 1998.

The cases were tried before *Charles J. Hely,* J., and motions for a new trial, filed on September 6, 2000, and December 23, 2002, respectively, were heard by him.

*Donald A. Harwood* for the defendant.

*Kelly-Anne DeFao,* Assistant District Attorney, for the Commonwealth.

KANTROWITZ, J. The defendant, an attorney, was convicted of attempting to procure another to commit perjury, G. L. c. 268, § 3, and intimidation of a witness, G. L. c. 268, § 13B. He appeals his convictions and the denial of his two motions for a

new trial,[1] alleging that (1) his motion to suppress oral communications he made to a police informant should have been allowed because the communications were illegally seized in violation of the Massachusetts wiretap statute, G. L. c. 272, § 99; (2) he received ineffective assistance of trial counsel in that counsel failed to investigate and call a potential witness, and failed to object to the introduction of unduly prejudicial evidence; and (3) the Commonwealth failed to disclose exculpatory evidence. We affirm.

*Background.* On July 4, 1998, Whitman police officers responded to a call from 71 Hancock Street (the McCracken residence) alleging that John Cavanaugh had assaulted a nine year old boy at that location. At the time, Cavanaugh was on probation and living at that address with his girlfriend, their infant son, her parents, her sister, and her son, the alleged victim.

Three days later, concerned that he was in violation of his probation imposed on an earlier incident, Cavanaugh sought legal advice from the defendant. Dissatisfied with the advice he received and wanting to guard against possible incarceration, Cavanaugh went to the Whitman police station to ask "if there's anything possible the Whitman Police could do for me" and offered to become an undercover informant.

Subsequently, on July 16 and 31, 1998, Cavanaugh made two controlled buys of relatively small amounts of marijuana from William Force, a police target, at Force's home. On August 4, 1998, Cavanaugh was involved in a third controlled buy, this time purchasing one pound of marijuana from Force, Francis LaCara, and another. Police officers were surveilling the purchase and subsequently arrested Force, LaCara, and Cavanaugh (to protect his identity as a confidential informant).

On August 11, 1998, Cavanaugh again contacted the

---

[1] In his pro se motion for a new trial, filed on September 6, 2000, the defendant raised four issues: (1) the motion to suppress; (2) the failure to disclose exculpatory evidence; (3) the decision not to instruct on entrapment; and (4) the verdict being contrary to the law and weight of the evidence. The motion was denied on September 15, 2000, a fact which neither the defendant nor his new attorney knew when the defendant filed an "amended" motion for a new trial on December 23, 2002. The "amended" motion was denied on December 30, 2002.

defendant, seeking representation concerning a civil restraining order scheduled to be heard on August 14. The two met that evening and again two days later.[2] Over the course of the meetings, the defendant informed Cavanaugh that he knew Cavanaugh was the confidential informant in the drug deal involving LaCara and essentially asked him to lie in future court proceedings concerning LaCara's culpability. The defendant explained he wanted Cavanaugh to exculpate LaCara because LaCara's mother was dating a client of his, Bryan Paine, and that LaCara was not a bad kid, that he wanted to go into the military, and that a felony conviction would foreclose that option. The defendant impressed upon Cavanaugh that his story must not implicate LaCara as a participant in the drug deal. To insure his desired outcome, the defendant supplied his own details of how Cavanaugh should craft his testimony regarding the drug purchase.

In an apparent attempt to frighten Cavanaugh, the defendant called Cavanaugh's girlfriend, in Cavanaugh's presence, and told her that LaCara and the others involved in the drug purchase knew Cavanaugh was the informant and that, as a result, her life and Cavanaugh's life were in danger. The search warrant affidavit stated that the defendant said that Paine, the assistant manager at the condominium complex where Cavanaugh lived, would tell "someone" where Cavanaugh and his girlfriend lived, and threatened that they "may be beaten, their vehicle may be damaged, or their child may be kidnapped by unknown people who are the source of the marijuana." He also told Cavanaugh that LaCara had been transported to his office from the Plymouth County house of correction to meet with the defendant and that LaCara intended to use the story the defendant created. To further motivate Cavanaugh, the defendant

---

[2]Between August 11 and August 20, the two met no less than six times. They had dinner on August 11 at a restaurant in Braintree and went to a Boston Red Sox game on August 13, to the Mohegan Sun Casino in Connecticut on August 16, to a café in Brockton and then to a bar in Bridgewater on August 18, to dinner in East Bridgewater on August 19, and to dinner at Cavanaugh's house on August 20. The frequency and location of the defendant's meetings with Cavanaugh appear to go beyond those ordinarily found in an attorney-client relationship.

promised that he could get Cavanaugh and his girlfriend away from the McCracken residence and into their own home, i.e., a condominium, for $10,000 to $15,000 less than the purchase price.

After that August 13 meeting, Cavanaugh met with Detective Sergeant Scott Benton of the Whitman police department and Lieutenant Robert Kelliher of the State police and disclosed that the defendant was attempting to intimidate and persuade him to change his story about the drug transaction involving LaCara.

On August 19, Cavanaugh agreed to wear a wire designed to allow the State police to secretly intercept and record his conversations with the defendant. Pursuant to G. L. c. 276, § 1,[3] Kelliher applied for and received a warrant authorizing the interception, under the one-party exception found in G. L. c. 272, § 99 B 4.[4] The conversations that were recorded thereafter tended to confirm Cavanaugh's allegations.[5]

---

[3] "Chapter 276 governs the issuance and return of search warrants. Section 1 provides, in part, that search warrants shall not be issued except on probable cause to believe that property or articles were obtained in the commission of a crime, a means or instrumentality of committing a crime, or possessed for an unlawful purpose. Section 1 further provides that '[n]othing in this section shall be construed to abrogate, impair or limit powers of search and seizure granted under other provisions of the General Laws or under the common law.' " *Commonwealth* v. *Penta,* 423 Mass. 546, 550 n.7 (1996), quoting from G. L. c. 276, § 1, as inserted by St. 1964, c. 557, § 1.

[4] The statutory provision states: "The term 'interception' means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the·use of any intercepting device by any person other than a person given prior authority by all parties to such communication; provided that it shall not constitute an interception for an investigative or law enforcement officer, as defined in this section, to record or transmit a wire or oral communication if the officer is a party to such communication or has been given prior authorization to record or transmit the communication by such a party and if recorded or transmitted in the course of an investigation of a designated offense as defined herein." G. L. c. 272, § 99 B 4, as inserted by St. 1968, c. 738, § 1.

[5] The defendant contends that the recorded conversations reflect his attempt to "flush [Cavanaugh] out" and get him to tell the truth by pointing out inconsistencies in his story. The defendant claims Cavanaugh's story kept changing. The defendant conceded, however, that he never confronted Cavanaugh during the recorded conversations with an allegation that Cavanaugh was changing his story, nor did the recorded conversations include any statement by the defendant that, in supplying details to craft Cavanaugh's story, he was merely referring back to details that Cavanaugh earlier told him in prior, unrecorded conversations.

The defendant was charged, tried, and convicted and now appeals.

*One-party consent.* "The secret transmission or recording of oral communications without the consent of *all* parties is generally proscribed by [G. L. c. 272, § 99]." *Commonwealth* v. *Blood,* 400 Mass. 61, 66 (1987). Two exceptions exist to this general rule. *Ibid.* First, the interception is not illegal if a warrant is secured pursuant to G. L. c. 272, § 99 F-M. *Id.* at 67. Second, the interception is not illegal if one party consents to the recording pursuant to G. L. c. 272, § 99 B 4. *Ibid.* If the second exception applies, a warrant is still necessary, resort being made to G. L. c. 276, § 1. *Commonwealth* v. *Penta,* 423 Mass. 546, 553 (1996).

To qualify for the one-party exception, the Commonwealth must demonstrate that (1) one party has consented to the interception of specific communications; (2) the investigation is of a "designated offense" as defined in G. L. c. 272, § 99 B 7; and (3) the designated offense is connected to organized crime. See *id.* at 551; *Commonwealth* v. *Abdul-Kareem,* 56 Mass. App. Ct. 78, 79 (2002). Organized crime has been defined as "a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services." G. L. c. 272, § 99 A, as inserted by St. 1968, c. 738, § 1. See *Commonwealth* v. *D'Amour,* 428 Mass. 725, 735 (1999). "That definition is not limited to activities which constitute 'a grave danger to the public welfare and safety, [or] brutal and violent tactics, [or demonstrate] that legitimate activities were . . . infiltrated.' . . . Moreover, the class of people subject to wiretaps includes more than 'full-time professional criminals.' " *Id.* at 735-736. (Citations omitted.)

Here, clearly the first two requirements of the one-party exception were met.[6] The defendant finds issue with the third requirement. He claims that Kelliher's search warrant affidavit did not establish the requisite organized crime nexus, and therefore, the defendant's motion to suppress should have been allowed. "The Commonwealth is not 'required to demonstrate probable cause of the existence of organized crime,' *Com-*

[6]The defendant concedes, as he must, that intimidation of a witness and subornation of perjury are designated offenses. See G. L. c. 272, § 99 B 7.

*monwealth* v. *Thorpe*, 384 Mass. [271, 279 (1981), cert. denied, 454 U.S. 1147 (1982)], but rather is 'required to show that the decision to intercept was made on the basis of a *reasonable suspicion* that interception would disclose or lead to evidence of a designated offense in connection with organized crime' (emphasis supplied). *Id.* at 281." *Commonwealth* v. *Zuluaga*, 43 Mass. App. Ct. 629, 634 (1997).

The requisite organized crime nexus, for purposes of the § 99 B 4 exception, has been found where a police officer, planning to take a civil service promotional exam, was approached by a retired police officer who offered to sell him a copy of the upcoming examination; the only presurveillance evidence of organized crime consisted of the police officer's testimony that the retired officer told him that the examination was available to him (the retired officer) "through an organization headed by a woman." *Commonwealth* v. *Thorpe*, 384 Mass. at 272, 279. The Supreme Judicial Court recognized, however, that "a certain amount of discipline and organization would be required to acquire and supply the examinations illicitly," as the exams were confidential and not readily available. *Id.* at 281.

So, too, an organized crime nexus can be found where the nature of the crime involved lends itself to the inference of organization and discipline involving more than two parties. See *Commonwealth* v. *Lykus*, 406 Mass. 135, 142 (1989) (a kidnapping case where the court found that the nature of the crime, in conjunction with evidence that the kidnapper had knowledge of the victim's family's cooperation with the police and made reference to "we" in conversations prior to the electronic interceptions, was sufficient to infer the necessary organization and discipline required for the § 99 B 4 exception to apply); *Commonwealth* v. *Zuluaga*, 43 Mass. App. Ct. at 634 (a narcotics case involving a large quantity of cocaine where the organized crime nexus was found based on the nature of the crime; the representation by the seller "that someone else would bring the cocaine, that the cocaine 'is the best thing in town' and that he, [the seller], 'had not been getting any complaints' "; and expert testimony that persons involved with large-scale drug sales "necessarily conduct their activities in concert with others").

There is a distinction, however, between the scenarios discussed above and "garden-variety" criminal activity where wiretapping is impermissible. See *Commonwealth* v. *D'Amour*, 428 Mass. at 737. Thus, in *Commonwealth* v. *Jarabek*, 384 Mass. 293, 296 (1981), the court ruled that the motion judge correctly "found no evidence of a continuing conspiracy by . . . a group, concluding that the statutory definition did not include a scheme by two municipal officials to extort a kickback from a single contractor."[7]

The defendant here postulates that the criminal activity in question was more akin to the "garden-variety" type discussed in *Jarabek* than that found in *Lykus* and *Zuluaga*, making the interception of his conversations pursuant to the § 99 B 4 exception impermissible. See *Commonwealth* v. *D'Amour*, 428 Mass. at 737. We disagree.

In *Jarabek*, prior to the wiretap, the police were certain of those involved in the kickback scheme and that it only involved two municipal officers. *Commonwealth* v. *Jarabek, supra* at 296. Conversely, in the instant case, the police lacked a clear vision of all of the people involved or the extent of the crime. More specifically, from the initial conversations (prior to the electronic surveillance), the police investigators knew some of the parties who were allegedly involved in the crime, but not all; some remained unnamed and unknown. Furthermore, the investigators did not know the extent to which those involved would go to achieve their desired outcome. They did know, however, that the defendant stated that Paine intended to tell "someone" where Cavanaugh lived and as a consequence Cavanaugh and his loved ones might suffer physical harm, their car damaged, or their child kidnapped by "unknown people who are the source of the marijuana." Terzian also told Cavanaugh that LaCara's brother had been murdered with a gun connected to the participants involved in the drug deal.[8] Furthermore, the police officers knew that the defendant told

---

[7]In *Jarabek*, while the wiretap evidence was suppressed, the live testimony of the person wearing the wire concerning the conversations was permitted. See *Commonwealth* v. *Jarabek*, 384 Mass. at 298.

[8]In fact, LaCara's brother had committed suicide, by hanging himself, a fact known by the defendant, as indicated by his comments captured on the

Cavanaugh that LaCara had been transported from jail to his office to meet with him and that LaCara and the others involved in the drug transaction knew Cavanaugh was the informant.

From this evidence the motion judge could correctly conclude that the requisite organized crime nexus had been established. Specifically he could infer a certain level of organization, planning, and discipline were required to fabricate and coordinate testimony to exonerate LaCara, and that a continuing conspiracy designed to intimidate a witness and suborn perjury was in play. See G. L. c. 272, § 99 A. As such, the gathering of further evidence by means of electronic surveillance pursuant to the § 99 B 4 exception was not improper and the defendant's motion to suppress was rightly denied.[9]

*Judgments affirmed.*

---

wiretap: "I did lie to you last night when I told you about the gun. . . . I want you to keep your fucking mouth shut."

[9]The defendant's remaining claims, that the Commonwealth failed to disclose exculpatory evidence and that he received ineffective assistance of counsel, are waived as they were not raised in his first motion for a new trial. See Mass.R.Crim.P. 30(c)(2), as appearing in 435 Mass. 1501 (2001); *Commonwealth* v. *Balliro*, 437 Mass. 163, 166 (2002) (defendant must raise all available grounds for relief in first rule 30 motion or claims are lost). We note that although the defendant raised an exculpatory evidence issue in his first motion, the evidence he claimed the Commonwealth withheld was different from the evidence he claimed the Commonwealth withheld in his "amended" motion. The claim, thus, is waived. "A finding of waiver does not end the analysis, however. All claims, waived or not, must be considered." *Commonwealth* v. *Randolph*, 438 Mass. 290, 293 (2002). After considering the claims under the standard set forth in *Randolph*, we hold that even if there was error, there was no substantial risk of a miscarriage of justice. Simply put, the tapes provided overwhelming evidence of guilt.