William Alexander **MAJOR**, Appellant,

v.

**COMMONWEALTH of Kentucky,**
Appellee.

No. 2007–SC–000734–MR.

Supreme Court of Kentucky.

Jan. 22, 2009.

As Corrected March 10, 2009.

Susan Jackson Balliet, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Heather Michelle Fryman, Assistant Attorney General, Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

This is a matter of right appeal, Ky. Const. § 110(2)(b), following a retrial before the Boone Circuit Court pursuant to our prior decision in *Major v. Commonwealth*, 177 S.W.3d 700 (Ky.2005) (hereafter referred to as *Major I*).

### Facts

The facts on retrial, with some exceptions, were essentially the same as in *Major I*. Appellant, William Major, and his wife, Marlene Major, had two (2) children, a son, D.O., and a daughter, L.B. By the fall of 1980, however, their marriage was failing. On the night of October 11, 1980, Marlene disappeared.

On November 29, 1981, the skull of a white female was found on a nearby farm belonging to the Waller family. Appellant worked there on occasion. In 2001, DNA testing[1] confirmed the skull belonged to a maternal relative of L.B.

---

1. Testing bone material for DNA did not become common practice until about 1996.

According to information contained in Marlene's diary, she had witnessed Appellant sexually molesting their son, D.O. On the day of her disappearance, she told her sister she had "proof" against Appellant hidden somewhere he would not find it, and if anything happened to her, the information would go to the police. In the same conversation, she told her sister about her unhappiness and that she was going to divorce Appellant. She spoke one more time with her sister that night, and seemed to be upset as a result of fighting that was occurring in her home.

Glen St. Hillaire lived near Appellant and Marlene on their property. He was friends with both and worked with Appellant in St. Hillaire's garage. Apparently he and Marlene were also romantically involved. In fact, Marlene had given St. Hillaire her diaries for safekeeping after an argument with Appellant.

At times when they were estranged due to arguments, Appellant would describe to others what he would do if Marlene ever left him. On several occasions, he even told St. Hillaire he would shoot Marlene, cut her head off and knock her teeth out, in order to make identification of her body difficult. Similar threats to dismember her body were made by Appellant in the presence of others.

On the night of October 11, 1980, St. Hillaire became concerned about Marlene. He saw Appellant near the Majors' trailer around 3:00 a.m. and asked about Marlene and the kids. Appellant told him he did not know where she was, but she had left with the children. However, Appellant had taken the children over to a neighbor's house around 11:00 p.m. and told them that Marlene had left him for St. Hillaire.

Over the next several days Appellant sold his holdings in Kentucky in preparation for moving to Rhode Island. He gave his three (3) weapons to his neighbor, Brice—a 9mm pistol, a shotgun and a .22 caliber rifle—and also sold him his tractor. On Wednesday of that week, he notified the Boone County Sheriff's office that Marlene was missing, claiming they had an argument and she left him. Subsequently, St. Hillaire notified the police of his concerns and ultimately they took possession of Marlene's diaries and the weapons Appellant had given Brice. Investigations in the general vicinity did not turn up her body.

Sometime later the detectives traveled to Rhode Island to speak with Appellant's son (D.O.) concerning the allegations of sexual abuse that occurred in Kentucky. Although they were unsuccessful in acquiring any useful information at the time, Appellant beat D.O. when he found out about the inquiries, accusing him of giving the police information.

However, after Appellant moved to Rhode Island with the children, the sexual abuse of D.O. continued. Moreover, Appellant then began to sexually abuse L.B. Ultimately, he was discovered, convicted and incarcerated in Rhode Island for the sexual abuse of the children. He remained incarcerated in Rhode Island for approximately ten (10) years, until sometime in 1996.

Thereafter, he was transported back to Kentucky on a detainer which had been issued against him for the prior sexual abuse of D.O. when they lived in Kentucky. It was during this incarceration, in 1996, on the detainer from Boone County, when he made a telephone call and confession to his father, Mr. James Major.

Later, in early 2001, detectives became aware of this 1996 phone conversation Appellant had with his father, wherein, he told Mr. Major that he had killed Marlene. Thereafter, the detectives went to Mr. Major's home in Nova Scotia in an attempt to

set up another phone conversation between Mr. Major and Appellant, hoping Appellant would acknowledge the confession. Mr. Major was cooperative in this, even suggesting his cover story would be that he only had a short time to live.

The call was made and it was taped by the detectives; however, Appellant's answers were evasive, such as, "Why do I get the feeling that somebody is trying to set me up?" When asked if he could say what happened, Appellant replied: "Even if I could, I probably wouldn't." When Mr. Major told him his daughter just wanted to know what happened, Appellant said to tell her to "ask Marlene's boyfriend in Indiana ... I think if they had a talk with him ... they might be surprised." When Mr. Major reminded Appellant "You told me you killed her." He replied: "At the time I was in jail and I was pretty well upset." At the time of this later conversation, Appellant was not under arrest, nor was he incarcerated.

Ultimately, around July of 2001, Appellant was charged and extradited back to Kentucky. Once in custody, he immediately began to ask questions about the investigation. He was advised of his Miranda rights and responded that he understood them. He then made a series of incriminating statements. Back in Kentucky, he met with Detective Jack Banks, was re-Mirandized, and thereafter gave the officers his version of the events that took place on the night of Marlene Major's death.

According to Appellant, they got into an argument in her Ford Pinto when she pulled a gun on him. He took it away from her and she began screaming; then, according to Appellant, he "lost it" and fired the gun until it was empty. After realizing he had killed her, he left her body in the Pinto and took the children to spend the night at his neighbor's, Trinnie Brice's, house. He then returned and took

Marlene's Pinto to the Waller Farm where he dumped her body into a sink hole, covered it with dirt and a piece of rolled fencing, and then tossed the murder weapon into a nearby pond. He even drew the police a map to aid in their search for her remains. As to her Ford Pinto, he indicated he had pushed it into the Ohio River near a ferry. Significantly, neither Marlene's body (other than the skull), the Ford Pinto, nor the pistol were ever located or recovered.

In *Major I,* this court reversed and remanded for a new trial because of (1) the improper admission of evidence of uncharged crimes, i.e., the later sexual abuse of L.B., and (2) the admission into evidence of firearms factually unconnected to the crime charged.

Upon retrial, a Boone County jury found Appellant guilty of one count of murder and guilty of one count of tampering with physical evidence and recommended life imprisonment for the murder and five years for tampering with physical evidence. The jury recommended the sentences to run consecutively. The trial court followed the recommendation of the jury as to the recommended sentences, but failed to designate how the sentences would run. Appellant now alleges error, to wit: 1) the trial court improperly admitted weapon testimony, 2) the wire tap was improper, 3) the trial court erred by denying his motion for mistrial, 4) the trial court failed to inform Appellant he could "control" his appointed co-counsel, and 5) he was improperly sentenced consecutively for definite and indefinite terms.

For the following reasons, we affirm the judgment and sentence entered by the trial court.

## I. Introduction of Weapon Testimony

Appellant contends that the testimony concerning the weapons was error. In *Major I,* we noted that:

[w]e have upheld the admission of weapons into evidence based upon testimony that the weapon was the one used in the commission of the offense, *Beason v. Commonwealth*, 548 S.W.2d 835 (Ky. 1977), or that it was of the same size and shape as the weapon used in the commission of the offense, *Sweatt v. Commonwealth*, 550 S.W.2d 520 (Ky.1977); or that it was found at the scene of the offense and was capable of inflicting the type of injury sustained by the victim, *Barth v. Commonwealth*, 80 S.W.3d 390 (Ky.2001). However, weapons, which have no relation to the crime, are inadmissible. *Gerlaugh v. Commonwealth*, 156 S.W.3d 747 (Ky.2005).

177 S.W.3d 700, 710–711 (Ky.2005). Thus, we held that it was error to introduce the "weapons [into evidence] without [a] connection to the crime." 177 S.W.3d at 711.

■ Prior to retrial, Appellant filed a motion in limine to exclude all testimony concerning the weapons Appellant possessed in 1980, i.e., the weapons that Appellant possessed and subsequently transferred following Marlene's disappearance. Appellant argued, *inter alia*, that this Court's ruling on weapons in *Major I* was to be broadly construed and should exclude all evidence of Major's weapons. In response, the Commonwealth argued that the ruling in *Major I* was much narrower, and covered only the introduction of the weapons themselves.

After discussion of the issue, the trial court prohibited introduction of the weapons as exhibits, but allowed witness testimony concerning the weapons. The trial court's ruling was based on Appellant's previously introduced statement that he would shoot Marlene if she tried to leave him, as well as expert testimony that the bullet wounds found on the recovered skull were consistent with projectiles from Appellant's weapons.

Subsequently, prosecution witness Glenn St. Hillaire testified that Appellant carried a gun. The trial court originally sustained Appellant's objection to this testimony, but later allowed it into evidence based upon the Commonwealth's assurance that later testimony would show that the gun was capable of producing the wounds present on the skull. The testimony of St. Hillaire established that there were guns at the Majors' home, which was the scene of the crime as Appellant agreed that he shot his wife outside of their home and it was also the last place Marlene was seen alive.

St. Hillaire testified that Appellant had a gun at Major's home approximately one month prior to his wife's disappearance, and that, while he was handling the gun, Appellant threatened that his wife "was not going anywhere". St. Hillaire also testified that once, when he and Marlene were sitting together talking by the nearby railroad tracks, they saw Major go in and out of St. Hillaire's camper with a gun in his hand. Lastly, Appellant objected and moved for a mistrial after St. Hillaire testified that he removed Appellant's .22 caliber gun from the Majors' home after Marlene's disappearance.

The trial court overruled Appellant's motion for mistrial based upon the Commonwealth's assertion that appropriate foundation testimony would be presented. The trial court later clarified its ruling, explaining that the ruling meant that the Commonwealth had to present testimony that Appellant's .22 could have caused the injuries evident on Marlene's skull, or had some other connection to the crime. The court also stated that introduction of weapon testimony was not a law-of-the-case issue, but, instead, a relevancy issue, and that the guns were relevant if they were of a type that could have caused the injuries to Marlene's skull. Additionally, the trial court found that weapons evidence is ad-

missible so long as its probative value was not substantially outweighed by the danger of undue prejudice and indicated that its rulings would be made on a case-by-case basis.

Shortly after the trial court's ruling on weapons, Appellant again sought to exclude weapon testimony prior to the testimony of prosecution witness Trinnie Brice. The trial court again ruled that weapon testimony was admissible if the Commonwealth established a foundation that the guns were of a type capable of inflicting the injuries to the victim.

Thereafter, Brice testified that as Appellant prepared to leave town after Marlene's disappearance and after sending his children to Rhode Island, Appellant gave or sold him several items, a tractor, three guns, a CB radio, along with a box of "stuff" that Appellant asked Brice to store in his closet for him. Brice turned the guns over to law enforcement.

David Spicer, a former acquaintance of Appellant, testified he heard Appellant say he would shoot his wife, cut her up, and that no one would ever find her. On cross-examination, Appellant asked Spicer if he thought the statement was serious. Spicer replied that he did take the matter seriously because Appellant "carried a gun on his hip."

Additionally, during cross-examination of the officers who transported Appellant to Kentucky from Massachusetts, it was developed that Appellant told the officers that he shot Marlene six times with a .38 caliber, and that he had been fond of telling people a false tale that he was a sniper in Vietnam, and was a prisoner of war.

Leroy Williams also testified that Appellant bragged that he could perform the "perfect murder." According to Williams, Appellant said he would shoot the victim, use the gun to knock out the teeth, cut off the feet, remove the lower jaw, and then scatter the pieces throughout the country so the victim could not be identified.

The Commonwealth also called Dr. Emily Craig. She described, in substantial detail, how she was able to examine the recovered skull to draw conclusions about the circumstances surrounding Marlene's death. The skull revealed that someone had attempted to decapitate the body with some type of tool, such as an ax or a large knife. Further, the obvious hole in the top of the skull was an exit wound resulting from a gunshot. These wounds occurred at or near the time of death, while the bone was still alive and flexible. In all likelihood, the bullet wound suggested that more than one shot was fired into the skull. Although it was impossible to determine what caliber firearm caused the wound, Dr. Craig testified that it could have been a 9 mm handgun, a .38 caliber revolver, a 12–gauge shotgun, a .22 rifle, or some similar firearm. The wound could not have resulted from another type of weapon, such as a BB gun. Other marks on the bone indicated that someone had attempted to remove the lower jaw with a tool.

■ In *Major I,* we held that the introduction of firearms owned by Appellant in 1980 was error, since the testimony did not establish that the weapons were in fact used in the murder of Marlene, were of the same size or shape as the weapon used in the commission of the offense, or were found at the scene and capable of inflicting the type of injury sustained. 177 S.W.3d at 710–711. Appellant now argues that this language serves to exclude otherwise relevant, properly admitted weapons testimony under the law-of-the-case doctrine. We disagree.

Although Appellant argues that *Major I* broadly controls all testimony in which a firearm is mentioned, our holding in *Major*

*I* was actually much narrower. *Major I* solely dealt with the physical introduction of weapons as items of evidence without adequate relevance to the events to which they were to be connected, not testimony about those weapons. This is clear given our citation of *Beason, Sweatt, Barth,* and especially *Gerlaugh. Major,* 177 S.W.3d at 710–711. Thus, because of the limited scope of our ruling in *Major I,* the trial court correctly recognized that the question concerning the testimony of weapons was one of relevancy.

Given Appellant's threats, their temporal proximity to Marlene's disappearance, the availability of weapons at the crime scene, and the similarities between the threats and the actual condition of the recovered skull, the weapons testimony was clearly relevant. Thus, the trial court was correct in allowing the introduction of evidence concerning the weapons in this instance because the evidence on retrial supplied a sufficient nexus, or relevancy, to the means and manner of Marlene's death. Therefore, we find no error in the introduction of weapon testimony.

## II. Taped Phone Conversation

Appellant argues that this Court, in *Major I,* and thus, the trial court on retrial, erred by allowing introduction of a tape of Appellant's father's phone conversation from *his home in Nova Scotia, Canada* with Appellant at *his home in Massachusetts,* without Appellant's consent. In *Major I,* this Court held that:

**2.** *Demoulas,* in fact, addressed the taping of face to face conversations of a Massachusetts resident in New York and Nova Scotia, rather than a telephone call.

**3.** *See Commonwealth v. Jarabek,* 384 Mass. 293, 424 N.E.2d 491 (1981), *but see, Commonwealth v. Gonzalez,* 426 Mass. 313, 688 N.E.2d 455, 456 (1997); *Commonwealth v. Lykus,* 406 Mass. 135, 546 N.E.2d 159, 164, n. 10 (1989); and *Commonwealth v. Pimentel,* 71

Since official proceedings had not been instituted against the Appellant for the murder of Marlene at the time of the taping, and he was not incarcerated, [the phone call] was not in violation of the Appellant's Fifth or Sixth Amendment rights. Moreover, even though the phone conversation took place [between] James Major's residence in Nova Scotia [and] the Appellant's residence, then in Massachusetts, the activity was appropriate under Kentucky Criminal Law, KRS 526.010; thus not in violation of his Fourth Amendment rights. The practice of recording conversations with the consent of at least one party to the conversation has long been recognized in Kentucky jurisprudence. *Carrier v. Commonwealth,* 607 S.W.2d 115 (Ky. App.1980); *see also Lopez v. U.S.,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963)

177 S.W.3d at 710. Our primary reasoning aside, we also noted, in footnote two (2) therein, that "in *Demoulas v. Demoulas Super Markets, Inc.,* 432 Mass. 43, 732 N.E.2d 875 (2000), a similar case involving a phone call from Nova Scotia to Massachusetts was approved." *Major,* 177 S.W.3d at 710 n. 2.[2]

On retrial, Appellant offered evidence of Massachusetts law to show this Court misapplied *Demoulas,* as well as additional authority tending to establish the taped phone call would be inadmissible in Massachusetts under their two-party consent doctrine.[3] He concedes in his brief, how-

Mass.App.Ct. 1103, 879 N.E.2d 138 (Table), 2008 WL 108762 (Mass.App.Ct.2008) ("The defendant's reliance on *Commonwealth v. Jarabek,* ... is misplaced, as here, unlike there, the focus and direction of the investigation was provided by a Federal agency, and the information gathered was intended for use in a Federal prosecution."); *Commonwealth v. Terzian,* 61 Mass.App.Ct. 739, 814 N.E.2d 370, 375 n. 7 (2004) ("In *Jarabek,* while the

ever, that Nova Scotia, from whence the call was placed, has a "one-party consent rule" like Kentucky. Appellant thus argues that the Court's citation to *Demoulas* and its interpretation of Massachusetts law undermines the reasoning of *Major I*, thus entitling Appellant to relief. We disagree.

■ First, the law-of-the-case doctrine mandates the trial court apply our holding. This is so because it is:

> an iron rule, universally recognized, that an opinion or decision of an appellate court in the same cause is the law of the case for subsequent trial or appeal however erroneous the opinion or decision may have been. The doctrine is predicated upon the principle of finality.

*Brooks v. Lexington–Fayette Urban County Housing Authority,* 244 S.W.3d 747, 751 (Ky.App.2007) (internal citation omitted). "When an appellate court decides a question concerning evidence ... the question of law settled by the opinion is final upon a retrial in which the evidence is substantially the same and precludes the reconsideration of the claimed error on a second appeal." *Williamson v. Commonwealth,* 767 S.W.2d 323, 325 (Ky.1989). At retrial, the evidence was the same as ruled on in *Major I.*

"A final decision of this Court, whether right or wrong, is the law-of-the-case and is conclusive of the questions therein resolved." *Williamson,* 767 S.W.2d at 325. "It is binding upon the parties, the trial court, and the Court of Appeals. It may not be reconsidered by prosecuting an appeal from a judgment entered in conformity therewith." *Id.* Moreover, "[o]ne cannot accept the benefits of that portion of an opinion which is favorable and later relitigate that portion which is not." *Id.* at

wiretap evidence was suppressed, the live testimony of the person wearing the wire con-

326. The appropriate remedy to correct any alleged error in an opinion of this court is to move for rehearing, pointing out the movant's arguments for consideration by the appellate court. *Id.; see also Buckley v. Wilson* 177 S.W.3d 778, 781 (Ky. 2005). In *Major I,* we reached a final determination regarding the admissibility of the same taped call, so the trial court was precluded from "entertain[ing] objections or mak[ing] modifications" to our decision. *Williamson,* 767 S.W.2d at 326. Thus, the trial court did not err in admitting the tape of the phone call.

■ Moreover, in multi-state matters, Kentucky traditionally follows the Restatement (Second) of Conflict of Laws (1988). *Cf., State Farm Mutual Auto. Ins. Co., v. Marley,* 151 S.W.3d 33, 42 (Ky.2004). In this instance, Restatement (Second) of Conflict of Laws, § 139(2) (1988) states:

> Evidence that is privileged under the local law of the state which has the most significant relationship with the communication but which is not privileged under the local law of the forum will be admitted unless there is some special reason why the forum policy favoring admission should not be given effect.

Thus, even were we to assume that Massachusetts had the most significant relationship with the communication—which we do not—there must be some special reason for Kentucky to forgo its acknowledged policy favoring admission of taped phone conversation with the consent of one party. Any other construction "would in effect place the criminal jurisprudence of one sovereignty under the control of another." *United States v. Reid,* 53 U.S. 361, 12 How. 361, 13 L.Ed. 1023 (1851), *overruled on other grounds by Rosen v.*

cerning the conversations was permitted.")

*United States,* 245 U.S. 467, 38 S.Ct. 148, 62 L.Ed. 406 (1918).

Under the facts at hand, we found—and find—no special reason to exclude the tape. Moreover, our decision here, and in *Major I,* is in accord with many other jurisdictions. *E.g., People v. Thompson,* 950 P.2d 608, 611 (Colo.Ct.App.1997) ("Although the communication occurred in Oregon, it directly concerned a serious crime allegedly committed by defendant in Colorado. The victim was a citizen of Colorado."); *State v. Lee,* 229 Conn. 60, 640 A.2d 553, 562 (1994) ("We decline to apply the law of another jurisdiction merely because a portion of the police investigation occurred there."); *State v. Lipham,* 910 A.2d 388, 390 (Me.2006) ("At the request of police, Lipham's wife placed a secretly recorded phone call to him in Alabama."); *Larrison v. Larrison,* 750 A.2d 895, 898 (Pa.Super.2000) ("While this Commonwealth has an interest in protecting its citizens from having telephone conversations recorded without proper consent, we, as the courts of this Commonwealth, have no power to control the activities that occur within a sister state."); *Kos v. State,* 15 S.W.3d 633, 636 (Tex.App.2000) ("Section 139(2) recognizes the 'strong policy' a forum state has in disclosing 'all relevant facts that are not privileged under its own local law.'"); *State v. Mayes,* 20 Wash. App. 184, 579 P.2d 999, 1005 (1978) ("Defendant urges that we read the statute literally and hold that Officer Christian's interception of Cindy Dickerson's phone conversations was illegal even though the interceptions took place in California, were principally to aid California police, and were not used to further any criminal activity in the state of Washington."); and *State v. Townsend,* 307 Wis.2d 694, 746 N.W.2d 493, 497 (Ct.App.2008) ("we conclude that Wisconsin law shall be applied to evidence gathered in a foreign state by a Wisconsin official charged with the duty to gather evidence for use in a Wisconsin criminal prosecution.").

■ Appellant, of course, implies that Massachusetts had the most significant relationship to this transaction because Major was living in Massachusetts. We strongly disagree.

At the time of Marlene's death, both she and Appellant were Kentucky residents. According to Appellant, her death occurred in Kentucky. Appellant transferred the alleged murder weapons in Kentucky to another Kentucky resident. Marlene's skull was found in Kentucky. D.O.'s sexual abuse, the beginning and continuation of which was advanced as a possible motive for Marlene's murder, occurred in Kentucky. The officers who participated in taping the phone conversation, with Appellant's father's permission, were Kentucky law enforcement officers, gathering information in a Kentucky investigation. The taped or intercepted conversation, between the father in Nova Scotia, Canada and the son, in Massachusetts, was intercepted with the father's permission, in Nova Scotia, not in Massachusetts. As Appellant has conceded, Nova Scotia, like Kentucky, allows taping with one-party consent. *See, R. v. Durate,* 1 S.C.R. 30 (Can.1990). Thus, the only contact Massachusetts had with the call was that Appellant's conversation was transmitted from Massachusetts to Nova Scotia, where it was taped by the officers, with Appellant's father's consent.

Moreover, as both this Court and the federal courts have recognized, Kentucky courts generally apply Kentucky law whenever it is justified. *Breeding v. Massachusetts Indemnity and Life Insurance Company,* 633 S.W.2d 717, 719 (Ky.1982) ("Justice, fairness and the best practical result may best be achieved by giving controlling effect to the law of the jurisdiction

which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation."); *see also Johnson v. S.O.S. Transport, Inc.,* 926 F.2d 516, 519 n. 6 (6th Cir.1991) ("Kentucky's conflict of law rules favor the application of its own law *whenever it can be justified.*") (emphasis added).

Thus, the application of Kentucky law was justified and the taped phone conversation was properly admitted.

### III. Motion for Mistrial

Appellant also argues the trial court erred in not granting his motions for mistrial. We disagree.

During the testimony of Deputy Jay Wuchner, a retired Boone County officer who participated in Major's first trial, he testified that he first saw a referenced exhibit during "the first trial that took place three (3) years ago." Appellant then moved for a mistrial, arguing that such prejudice could not be cured by an admonition. The trial court overruled the motion for a mistrial, but noted that it would admonish the jury. The issue was then passed to the next morning as to avoid calling more attention to the comment.

The next morning, Appellant again urged a mistrial based on the cumulative nature of "what's come out," including Appellant's conviction for child molestation in Rhode Island, alleged excessive gun evidence, and Wuchner's mention of the prior trial. The trial court again denied the motion. Appellant then requested the admonition. The parties then submitted admonitions and the trial court combined the proposed admonitions and read the agreed-upon version to the jury. The admonition instructed the jury that there are many proceedings that lead up to a trial, and thus, references to prior testimony are not part of the evidence to be considered.

On review, we note "the decision to grant a mistrial is within the sound discretion of the trial court, and such a ruling will not be disturbed absent an abuse of that discretion." *Woodard v. Commonwealth,* 147 S.W.3d 63, 68 (Ky.2004); *see also Bowling v. Commonwealth,* 873 S.W.2d 175 (Ky.1994). While we are mindful that the trial court's discretion is not "unlimited," *Sharp v. Commonwealth,* 849 S.W.2d 542, 547 (Ky.1993), we have previously found that the trial court, in its discretion, may choose to admonish the jury instead of granting a mistrial; this is so because an admonition is presumed to cure a defect in testimony. *Alexander v. Commonwealth,* 862 S.W.2d 856, 859 (Ky. 1993) (*overruled on other grounds by Stringer v. Commonwealth,* 956 S.W.2d 883, 891 (Ky.1997)); *Johnson v. Commonwealth,* 105 S.W.3d 430, 441 (Ky.2003); *see also Price v. Commonwealth,* 59 S.W.3d 878, 881 (Ky.2001). This presumption is only overcome 1) when an overwhelming probability exists that the jury is incapable of following the admonition and a strong likelihood exists that the impermissible evidence would be devastating to the defendant; or 2) when the question was not premised on a factual basis and was inflammatory or highly prejudicial. *Alexander,* 862 S.W.2d at 859; *Johnson v. Commonwealth,* 105 S.W.3d 430, 441 (Ky.2003); *Derossett v. Commonwealth,* 867 S.W.2d 195, 198 (Ky.1993); *Bowler v. Commonwealth,* 558 S.W.2d 169, 171 (Ky.1977); *see also Greer v. Miller,* 483 U.S. 756, 766, n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987).

Here, the trial court reviewed Wuchner's statement and correctly found that the admonition would cure the defect. We further note that the statement at issue here, referring only briefly to a previous trial, did not indicate any favorable or unfavorable outcome, and thus did not

raise any of the concerns addressed in *Alexander*. Therefore, we find no abuse of discretion.

## IV. Role of Appointed Counsel

Appellant also asserts the trial court erred by failing to allow him complete control of his defense and co-counsel.

Appellant initially complained about the services of his appointed counsel in a letter to the trial court dated May 31, 2006, wherein he informed the court that he had instructed one of his attorneys to withdraw because he had tried to "deal with her" and had "no success." He stated that his decision was based on a conversation with a receptionist at the Department for Public Advocacy (hereinafter "DPA"), during which he was told that his attorney was not available to speak with him.

The trial court set a hearing for July 28, 2006, to address Appellant's motions and letters. During that hearing, Appellant spoke to the trial court at length about his abilities, his limitations, and his problems with counsel. Appellant argued that his primary concern was that he had a list of people that he needed to locate but that his attorneys did not want to locate them;[4] that he really wanted the trial court to appoint a particular attorney, which DPA had previously transferred to Kenton County; that he was mad that a receptionist had been "rude" to him and therefore he now refused to call his attorney's office. Appellant stated that he wanted an attorney who would raise the points Appellant felt were important to his defense, and that he may or may not want to be the ultimate decision maker. The trial court did not enter a finding but, instead, asked Appellant to share his feelings with his counsel and to trust his attorneys because they were excellent attorneys.

Later, the Commonwealth requested an evaluation by Kentucky Correctional Psychiatric Center (hereinafter "KCPC") due to increasing concerns about Appellant's competency. Appellant's co-counsel agreed that a competency hearing was needed and stated that he had doubts concerning Appellant's competency, including his competency to assist counsel or to put on any defense *pro se*. Following an order requiring Appellant to undergo a competency evaluation, the trial court set a competency hearing for May 3, 2007.

During the competency hearing, the KCPC psychiatrist, Dr. Timothy Allen, reported that Appellant's ability to process and analyze information was slow, but that he possessed average intellectual functioning, with a 107 verbal IQ, 110 overall, and appeared to have a good memory. Testimony also revealed that Appellant, as a result of a stroke in 1995, was literally missing the center two-thirds (2/3) of the right side of his brain. The two-thirds of the right side of Appellant's brain, which controls memory, emotion, speech, artistic expression, free thinking, the rhythm and tone of speech, and, according to some scientists, the ability to tell the truth, had seemingly died and had been reabsorbed and replaced by fluid. The left side of Appellant's brain, responsible for cognitive functions, problem solving, understanding, and word recognition, was unharmed and capable of performing its assigned tasks virtually unimpaired.

Further, the psychiatrist discounted Appellant's claimed inability to recall events prior to the 1995 stroke, stating there was no evidence of memory dysfunction for current events. Dr. Allen said Appellant knew his own case in exhaustive detail, could describe specific statutes and rules

---

4. This complaint ignored the "near-impossibility" of locating numerous alleged character witnesses twenty-seven (27) years after Marlene's disappearance.

of law, knew what evidence should not be admitted, knew about the jury process, and all functional aspects of his defense. He stated Appellant had no difficulty staying on task, no problem being decisive, and no problem focusing. He stated that Appellant, however, suffered from cognitive dysfunction (NOS), and processes information more slowly than an average person, but also stated that he was able to have a very complex conversation with Appellant. Thereafter, the trial court found Appellant competent to stand trial.

Given the information from KCPC, the trial court held a second hearing on May 15, 2007, to address Appellant's complaints regarding his attorneys. In its order, the trial court found Appellant was not entitled to appointed counsel of his own selection, and that he had a long history of complaining about his attorneys, both past and present. Further, the trial court found the testimony of Dr. Allen of KCPC confirmed what the trial court had already observed (and what Appellant admitted), that Appellant had great difficulty processing information in circumstances that required quick action. Given Appellant's limitations, the trial court found that Appellant's competency to act as his own representative at trial was limited. It also determined that Appellant could conduct direct examinations because he could prepare his questions ahead of time, but other trial functions required Appellant to quickly analyze and respond to information, and Appellant lacked that ability.

■ Appellant also argues that the trial court erred by not informing him of the role he had a right to play in his defense, i.e., lead counsel. Appellant claims that by not specifically telling Appellant that he had a right to set trial strategy, direct the investigation, and set the theory of the defense, that he was deprived of his right to a fair trial. We disagree.

■ The United States Supreme Court has held that a criminal defendant has a constitutionally protected right to present his own defense in addition to a constitutionally protected right to be represented by counsel. *Faretta v. California*, 422 U.S. 806, 833–34, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). However, axiomatically, by electing to exercise one's constitutional right to present one's own defense, a defendant necessarily waives their constitutional right to be represented by counsel. *United States v. Mosely*, 810 F.2d 93, 97 (6th Cir.1987) (*quoting United States v. Conder*, 423 F.2d 904, 908 (6th Cir.1970)) ("The right to defend *pro se* and the right to counsel have been aptly described as 'two faces of the same coin,' in that waiver of one right constitutes a correlative assertion of the other.")

■ Section 11 of the Kentucky Constitution also recognizes the ability of a defendant to proceed without counsel. Ky. Const. § 11 ("In all criminal prosecutions the accused has the right to be heard by himself and counsel."). Further, Section 11 serves as the basis of the right to hybrid counsel, or the right to be heard "by himself and counsel." *See* Ky. Const. § 11. Thus, in Kentucky, unlike in federal courts, "an accused may make a limited waiver of counsel, specifying the extent of services he desires, and he then is entitled to counsel whose duty will be confined to rendering the specified kind of services (within, of course, the normal scope of counsel services)." *Wake v. Barker*, 514 S.W.2d 692, 696 (Ky.1974).

■ In *Wake*, we held that, upon an unequivocal request to appear *pro se* or an unequivocal request to limit the role of appointed counsel, the trial court must conduct a hearing to determine that any such waiver is made knowingly and intelligently. 514 S.W.2d at 697. This comports

with the requirements and protections afforded in *Faretta*. However, the protections of *Faretta* and *Wake* are only triggered if the requests are unequivocal and timely made. *See Soto v. Commonwealth*, 139 S.W.3d 827, 857 (Ky.2004).

■ A waiver of counsel by a borderline-competent *pro se* defendant, adds, however, additional difficulties to an already complex clash of fundamental constitutional rights, i.e., the right to self-representation, the right to be represented by counsel, and the right to a fair trial.

> It is well-settled that a criminal defendant may not be tried unless he is competent and he may not waive his right to counsel or plead guilty unless he does so competently and intelligently. In *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (*per curiam*), we held that the standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him."

*Godinez v. Moran*, 509 U.S. 389, 396, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (internal citation omitted). Upon a finding of competence to stand trial, a criminal defendant is deemed to be competent enough to choose to waive any of his constitutional rights. This is so because:

> [a] defendant who stands trial is likely to be presented with choices that entail relinquishment of the same rights that are relinquished by a defendant who pleads guilty: He will ordinarily have to decide whether to waive his "privilege against compulsory self-incrimination," *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), by taking the witness stand; if the option is available, he may have to decide wheth-

er to waive his "right to trial by jury," *id.;* and, in consultation with counsel, he may have to decide whether to waive his "right to confront [his] accusers," *id.*, by declining to cross-examine witnesses for the prosecution. A defendant who pleads not guilty, moreover, faces still other strategic choices: In consultation with his attorney, he may be called upon to decide, among other things, whether (and how) to put on a defense and whether to raise one or more affirmative defenses. In sum, *all* criminal defendants—not merely those who plead guilty—may be required to make important decisions once criminal proceedings have been initiated. And while the decision to plead guilty is undeniably a profound one, it is no more complicated than the sum total of decisions that a defendant may be called upon to make during the course of a trial. (The decision to plead guilty is also made over a shorter period of time, without the distraction and burden of a trial.) This being so, we can conceive of no basis for demanding a higher level of competence for those defendants who choose to plead guilty. If the *Dusky* standard is adequate for defendants who plead not guilty, it is necessarily adequate for those who plead guilty.

*Id.* at 398–399, 113 S.Ct. 2680 (emphasis in original). Thus, "since there is no reason to believe that the decision to waive counsel requires an appreciably higher level of mental functioning than the decision to waive other constitutional rights," a *Dusky* finding of competence to stand trial entails a finding of competence to exercise or waive any other constitutional right. *Id.* at 399, 113 S.Ct. 2680.

Yet, when weighing competence against the right to counsel or self-representation under the *Godinez* standard, "[w]e must keep in mind that our inquiry is whether

[the defendant] competently waived his right, not whether he was competent to represent himself." *Commonwealth v. Berry*, 184 S.W.3d 63, 68 (Ky.2005) (internal citations omitted); *see also Chapman v. Commonwealth*, 265 S.W.3d 156 (Ky. 2007). *Indiana v. Edwards*, —— U.S. ——, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008), recently decided, now squarely addresses this interplay between competence and the right to self-representation when a borderline competent defendant seeks to defend himself at trial.[5]

Like here, *Edwards* involved a borderline-competent defendant who sought to assert his right of self-representation on retrial, yet the trial court denied his request. The defendant then went to trial with the assistance of his appointed counsel and was convicted. He appealed to the Indiana Supreme Court, which found that *Faretta* and *Godinez* required the state to allow Edwards to represent himself. The United States Supreme Court then accepted certiorari.

The Court, in *Edwards*, defined the issue as a "a mental-illness-related limitation on the scope of the self-representation right." —— U.S. ——, 128 S.Ct. at 2384. The Court then distinguished *Faretta*, stating "it does not answer the question before us both because it did not consider the problem of mental competency" (*cf.* 422 U.S., at 835, 95 S.Ct. 2525 (*Faretta* was literate, competent, and understanding")), and because *Faretta* itself and later cases have made clear that the right of self-representation is not absolute. *Edwards*, —— U.S. at ——, 128 S.Ct. at 2384.

Here, as in *Edwards*, the borderline competent defendant sought to control his own trial proceedings raising additional considerations beyond the scope of *Godi-*

*nez* or *Chapman*. Moreover, "*Godinez* involved a State that sought to *permit* a gray-area defendant to represent himself. *Godinez's* constitutional holding is that a State may do so. But that holding simply does not tell a State whether it may deny a gray-area defendant the right to represent himself." *Edwards*, —— U.S. at ——, 128 S.Ct. at 2385 (emphasis in original).

To address the gray area, balancing competency with the right to self-representation, the Court in *Edwards* noted that the seminal mental competency cases, *Dusky* and *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), focus directly upon the borderline defendant's "present ability to consult with his lawyer," *Dusky*, 362 U.S. at 402, 80 S.Ct. 788, a "capacity ... to consult with counsel," and ability to "assist counsel in preparing his defense." *Drope*, 420 U.S. at 171, 95 S.Ct. 896. ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, *to consult with counsel*, and to assist in preparing his defense may not be subjected to a trial" *Id.* (emphasis added)). Thus, *Dusky* and *Drope* assume representation by counsel and emphasize its importance.

In addition, the foundational self-representation case, *Faretta*, bases its analysis in part on pre-existing state law cases which are consistent with, or adopt, a competency limitation on the right of self-representation. *See* 422 U.S. at 813, and n. 9, 95 S.Ct. 2525, (citing sixteen (16) state-court decisions and two secondary sources); *e.g., Cappetta v. State*, 204 So.2d 913, 917–918 (Fla.App.1967), rev'd on other grounds, 216 So.2d 749 (Fla.1968) (assur-

---

**5.** We note that *Indiana v. Edwards* was rendered after Appellant's trial and retrial, and thus refer to it only as persuasive authority.

ing a "mentally competent" defendant the right "to conduct his own defense" *provided that* "no unusual circumstances exist" such as, *e.g.*, "mental derangement" that "would ... depriv[e]" the defendant "of a fair trial if allowed to conduct his own defense," 204 So.2d, at 917–918); *id.*, at 918 (noting that "whether unusual circumstances are evident is a matter resting in the sound discretion granted to the trial judge"); *Allen v. Commonwealth*, 324 Mass. 558, 87 N.E.2d 192, 195 (1949) (noting "the assignment of counsel" was "necessary" where there was some "special circumstance" such as when the criminal defendant was "mentally defective").

Drawing on such precedent, *Edwards* also notes that sometimes "an individual may well be able to satisfy *Dusky's* mental competence standard, for he will be able to work with counsel at trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel." *Edwards*, —— U.S. at ——, 128 S.Ct. at 2386. Therefore, allowing such a defendant to try his own case would not "affirm the dignity" of a borderline competent defendant. *McKaskle v. Wiggins*, 465 U.S. 168, 176–177, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) ("Dignity" and "autonomy" of individual underlie self-representation right).

Moreover, the "proceedings must not only be fair, they must 'appear fair to all who observe them.'" *Edwards*, —— U.S. ——, 128 S.Ct. at 2386 (quoting *Wheat v. United States*, 486 U.S. 153, 160, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)). While application of *Dusky's* basic mental competence standard can help in part to avoid an unfair result, given the different capacities needed to proceed to trial without counsel,

there is little reason to believe that *Dusky* alone is sufficient. *See Dean v. Commonwealth*, 777 S.W.2d 900, 908 (Ky.1989) (overruled on other grounds by *Caudill v. Commonwealth*, 120 S.W.3d 635 (Ky.2003)) ("Even if a defendant is found competent to stand trial, he may not be capable of making an intelligent decision about his defense.") Thus, "the trial judge, particularly one such as the trial judge in this case, who presided over ... [Appellant's] competency hearings and his two trials, will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Id.*

In conclusion, *Edwards* found that:

the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.

—— U.S. ——, 128 S.Ct. at 2387–2388.

*Edwards* thus recognizes a trial judge's right to take a realistic account of a particular defendant's mental capacities and to create an individualized representation specifically tailored to a defendant's abilities; a just mix designed to assure defendants, such as Appellant, a fair trial.

▮ In the case-at-bar, the trial court addressed the considerations raised in *Edwards*.[6] Several hearings were held and

---

**6.** The trial court held multiple hearings on the issue of Appellant's competency and his interaction with his attorneys. Beginning May 31, 2006, when Appellant informed the trial court

that he instructed his attorney to withdraw because he had tried to "deal with her" with "no success," and continuing until the trial court's final ruling on Appellant's competen-

Appellant was found competent to stand trial with the assistance of counsel under the *Dusky* standard. As a result of his competence, Appellant was entitled to assert his right to self-representation, thereby waiving his right to counsel, or, in the alternative, to assert his right to hybrid counsel, dictating the extent of counsel's involvement pursuant to Section 11 of the Kentucky Constitution. After Appellant's assertion,[7] however, because of his borderline competency, the trial court had the right to deny the Appellant the right to proceed *pro se* and to structure the role and scope of hybrid counsel employed in this instance. This is consistent with our previous pronouncements in *Dean,* 777 S.W.2d at 908, and *Jacobs v. Commonwealth,* 870 S.W.2d 412, 418 (Ky.1994) ("For, even if a defendant is found competent to stand trial, he may not be capable of making an intelligent decision about his defense.")

Moreover, in its May 17, 2007, order, the trial court properly included (as it should in these instances) an extensive explanation of its reasoning as to what sort of representation Appellant was capable of and/or needed. Amongst its findings:

> [Appellant] is not competent to completely participate in trial. While [he] has the ability to research and write when under no time constraints he does not have the ability to process information quickly enough to participate meaningfully in a Court of Law. To allow [Appellant] to try his own case would in effect mean that he will not receive a fair trial.

[Therefore, Major] is specifically not competent to voir dire a jury, to make opening or closing statements or cross-examine witnesses. He is competent to directly examine witnesses provided he has prepared written questions to read from. If a trial were conducted by written questions [Appellant] could adequately perform. Unfortunately for [Appellant], his disabilities will not allow him to competently participate in the way our justice system has dictated that trials are to be conducted. He is intelligent enough to make a determination as to whether to take the stand as a witness but it is the intention of the Court to conduct an in camera hearing if [Appellant] chooses such a course of action to assure *Faretta* safeguards are met.

Thus, in the present instance, there were compelling reasons weighing against full dismissal of Appellant's counsel, namely to safeguard against Appellant's demonstrated mental limitations. Thus, Appellant was properly precluded from appearing *pro se* during those phases of the trial as affected, but, nonetheless, was allowed to represent himself in those phases of the trial not so precluded, a right he left largely unexercised.

Therefore, considering the extensive efforts put forth by the trial court to protect Appellant's rights to proceed *pro se* and by "hybrid co-counsel," as well as his right to a "fair trial," we find no abuse of discretion in the trial court's actions in this regard and thus, no error.

---

cy, on May 15, 2007, Appellant's competency and relationship with his attorneys were repeatedly before the court.

**7.** This assumes, without finding, that Appellant's request was unequivocal. The record is far from clear on the subject. Appellant never clearly requested self-representation. Ap-

pellant stated that he wanted an attorney, but that he wanted an attorney who would follow his instructions. Yet, Appellant also stated that he was unsure if he wanted to be the ultimate decision-maker for his capital murder defense.

## V. Sentencing Issues

Finally, Appellant argues the trial court erred by sentencing him to five (5) years for the charge of tampering with physical evidence to run consecutively with his life sentence for murder. Appellant correctly cites to KRS 532.110 for the proposition that definite and indefinite terms must run concurrently, and that all such sentences shall be satisfied by the service of the indefinite term. Moreover, we have previously held that no sentence can be ordered to run consecutively with a life sentence. *Mabe v. Commonwealth*, 884 S.W.2d 668, 673 (Ky.1994).

Although the Judgment and Sentence in this case notes that the jury recommended the sentences run consecutively, there is no order designating that the sentences are to run consecutively. KRS 532.110(2) clearly states that sentences will run concurrently when an order does not specify the manner in which sentences are to run.

Therefore, the sentences here are to run concurrently pursuant to KRS 532.110(2), not consecutively as asserted by Appellant. Thus, we find no error.

### Conclusion

For the foregoing reasons, the judgment and sentence herein is affirmed.

All sitting. All concur.